[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 00-13083
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 13, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 99-00125-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARVIN BAKER,
WAYNE BAPTISTE
a.k.a. "Fat Wayne",
MICHAEL HARPER
a.k.a. "Cuban Mike",
ARTHUR PLESS
a.k.a. "Plex",
KENNETH WILLIAMS a.k.a.
"Boobie" a.k.a. "Black",
SUSAN HALL GIBSON
a.k.a. "Miss Sue",
LEONARD BROWN a.k.a.
Bo,
EFRAIN CASADO a.k.a. "E-4"
a.k.a. "Efro",
JONATHON HAWTHORNE a.k.a.
"Moose",
MALCOLM SHAW,
BEN H. JOHNSON
a.k.a "Bush",

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____
(December 13, 2005)

Before BARKETT and MARCUS, Circuit Judges, and GEORGE[*], District Judge.

BARKETT, Circuit Judge:

Eleven defendants appeal their convictions for drug trafficking offenses after a jury trial. Seven of these defendants also appeal their sentences. We address each of the defendants' arguments in turn, and AFFIRM the convictions and sentences of Williams, Casado, Harper, Leonard Brown, Malcolm Shaw, Baker, Baptiste, Pless and Gibson; REVERSE the convictions of Johnson and Hawthorne; and REMAND the case to the district court for proceedings consistent with this opinion.

## I. BACKGROUND

The government accused fifteen defendants of drug trafficking offenses in a seventeen-count indictment: Kenneth Williams, Efrain Casado, Leonard Brown, Lenard Brown, Susan Hall Gibson, Bernard Shaw, Marvin Baker, Malcolm Shaw, Ronald Raye, Wayne Baptiste, Michael Harper, Arthur Pless, Ben Johnson,

[*] Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation.

2

Jonathon Hawthorne, and Charton Darces.[1]  Three defendants, Bernard Shaw,

---

[1] Count 1:    Charged Williams and Casado with engaging in a continuing criminal enterprise (CCE), in violation of 21 U.S.C. §§ 848(a), (b)(2)(A), based on predicate violations under 21 U.S.C. §§ 841(a)(1), 846, and 963;

Count 2:    Charged all fifteen defendants with conspiracy to possess with intent to distribute and to distribute in excess of 5kg of cocaine and 50g of cocaine base, from in or about January 1990, and continuing through in or about January 1998, in violation of 21 U.S.C. §§ 841(a)(1) and 846;

Count 3:    Charged Williams, Leonard Brown, Lenard Brown, and Charlton Darces with conspiracy to import in excess of 5kg of cocaine into the United States, in violation of 21 U.S.C. §§ 952(a) and 963;

Count 4:    Charged Williams with distribution of in excess of 500g of cocaine and 50g of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

Count 5:    Charged Harper with distribution of in excess of 50g of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

Count 6:    Charged Williams with distribution of in excess of 5kg of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

Count 7:    Charged Shaw with distribution of in excess of 500g of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

Count 8:    Charged Casado with distribution of in excess of 500g of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

Count 9:    Charged Williams, Leonard Brown, and Lenard Brown with distribution of in excess of 500g of cocaine and 50g of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

Count 10:    Charged Casado with distribution of in excess of 500g of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

Count 11:    Charged Shaw with distribution of in excess of 500g of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

Count 12:    Charged Shaw with distribution of in excess of 5kg of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

Count 13:    Charged Williams with distribution of in excess of 50g of cocaine base in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

Count 14:    Charged Harper with distribution of in excess of 50g of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

Count 15:    Charged Pless with distribution of in excess of 50g of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

Count 16:    Charged Williams, Casado, Leonard Brown, Lenard Brown, Pless, Johnson, and Hawthorne with conspiracy to use and carry a firearm during and in relation to a drug trafficking crime as set forth in Count 2, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 942(o) and its predecessor, 18 U.S.C. § 924(n); and

Count 17:    Charged Gibson with knowingly maintaining a place at 7285 NW 17th Court, Miami, FL, for the purpose of manufacturing, distributing, and using cocaine and cocaine base, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2.

3

Ronald Raye, and Charlton Darces, pled guilty before the start of trial. Lenard

Brown[2] died of a congenital heart defect before trial.

The centerpiece of the government's case-in-chief was its evidence

implicating the remaining eleven defendants in the conspiracy to distribute and to

possess with intent to distribute cocaine alleged in Count 2. That evidence, part of

a thirty-one day trial featuring over one hundred witnesses, accused them of being

part of a gang that the media, riffing on Williams' nickname "Boobie," had dubbed

the "Boobie Boys." However, the government's witnesses, many of them

incarcerated former associates of Williams or his co-defendants, described the

"Boobie Boys" not as a stereotypical "gang" with colors, hand signals, or other

visible signs of membership, but rather as an informal association of people from

the Miami area.

The overall thrust of the hundreds of hours of witness testimony was that

Williams and Casado, who had been operating their own, independent drug

distribution networks with their friends in the Miami area, met in prison in 1992

and combined forces to create a massive drug distribution operation based in South

Florida, in which the remaining thirteen defendants played a part. Raye, Bernard

and Malcolm Shaw, Harper, the Brown twins, and their mother Susan Hall Gibson

---

[2] Lenard Brown was Leonard Brown's twin brother. To avoid confusion, we refer to all
defendants by their last names except for the Brown twins and Malcolm and Bernard Shaw.

4

were all friends of Williams from the Miami neighborhoods of Carol City, Overtown, and Liberty City. Baptiste was Casado's close friend and business partner. Pless and Johnson, themselves friends, knew both Casado and Williams. Hawthorne, a paid lookout for a small-time drug dealer who did business with Williams, allegedly started to deal drugs directly with the "Boobie Boys." Charlton Darces was a Port of Miami longshoreman who, according to the evidence, helped the "Boobie Boys" import cocaine. The government's case was also replete with evidence, some of it quite graphic, that Williams, Casado, Leonard Brown, Baptiste, Harper, Pless, Johnson, and Hawthorne committed murders in furtherance of this conspiracy.[3]

---

[3] Although the relevant conspiracy statute, 21 U.S.C. § 846, does <u>not</u> require proof of an overt act in furtherance of the conspiracy, <u>United States v. Shabani</u>, 513 U.S. 10, 13, 115 S. Ct. 382, 130 L. Ed. 2d 225 (1994), the government listed in the indictment twenty-six "overt acts," many of them homicides, allegedly done in furtherance of the Count 2 conspiracy. As we discuss <u>infra</u>, the government cannot render evidence of an otherwise inadmissible overt act admissible simply by placing it into the indictment itself. The overt acts cited are as follows:

1. In or about early January, 1992, in Miami, Miami-Dade County, defendants KENNETH WILLIAMS, BERNARD SHAW and RONALD RAYE delivered approximately one kilogram of cocaine base, or "crack", to an individual who was later arrested in St. Lucie County, Florida in possession of the crack.
2. On or about December 23, 1993, in Miami, Miami-Dade County, defendants ARTHUR PLESS and BEN JOHNSON participated in the shooting death of Roosevelt Davis.
3. On or about January 29, 1994, in Miami, Miami-Dade County, defendants WAYNE BAPTISTE and EFRAIN CASADO distributed one-half kilogram of cocaine to another individual.
4. On or about March 17, 1994, in Miami, Miami-Dade County, defendant KENNETH WILLIAMS and others participated in the shooting death of Benny Brownlee.
5. In or about mid-May, 1994, in Miami, Miami-Dade County, defendant

KENNETH WILLIAMS delivered approximately 500 grams of powder cocaine and 1.13 kilograms of cocaine base or "crack" to a courier who transported the crack to Augusta, Georgia at the defendant's direction.

6. On or about June 22, 1994, in Miami, Miami-Dade County, defendants KENNETH WILLIAMS and EFRAIN CASADO participated in the shooting death of Walter Betterson and Derrick Harris.

7. On or about September 18, 1994, in Miami, Miami-Dade County, defendants ARTHUR PLESS and BEN JOHNSON shot to death Everett Cooper.

8. On or about November 4, 1994, in Miami, Miami-Dade County, defendant ARTHUR PLESS and others participated in the shooting death of Johnny Beliard.

9. In or about late November of 1994 or December of 1994, in Miami, Miami-Dade County, defendant MICHAEL HARPER delivered approximately two kilograms of cocaine base, or "crack" to an individual who in turn transported the crack to Georgia, a portion of which was later seized by authorities.

10. In or about early to mid-March of 1995, in Miami, Miami-Dade County, defendant KENNETH WILLIAMS delivered several kilograms of cocaine to a courier who transported the cocaine to Pensacola, Florida at WILLIAMS' direction.

11. In or about mid-May of 1995, in Miami, Miami-Dade County, defendant MALCOLM SHAW delivered several kilograms of cocaine to an individual who transported the cocaine to Columbia, South Carolina for distribution.

12. On or about May 17, 1995, in Miami, Miami-Dade County, defendants EFRAIN CASADO, ARTHUR PLESS and BEN JOHNSON participated in the shooting deaths of Otis Green, Alice Mae Gardner, and Michael Frazier.

13. In or about late October of 1995 or early November of 1995, in Miami, Miami-Dade County, defendant EFRAIN CASADO delivered several kilograms of cocaine base, or "crack" to an individual. Approximately two and one-half kilograms of crack which remained from this crack were seized by law enforcement authorities in West Palm Beach, Florida on November 2, 1995.

14. In or about late December of 1995, in Miami, Miami-Dade County, defendants KENNETH WILLIAMS, LEONARD BROWN and LENARD BROWN delivered cocaine and cocaine base, or "crack" to an individual, a portion of which was later seized by law enforcement authorities on March 6, 1996.

15. In or about early January of 1996, in Miami, Miami-Dade County, defendant MALCOLM SHAW delivered approximately one and one-half kilograms of cocaine to an individual who transported the cocaine to Tallahassee, Florida for distribution, a portion of which was later seized by law enforcement authorities on January 7, 1996.

16. In or about early February of 1996, defendant MALCOLM SHAW delivered approximately two kilograms of cocaine to an individual, which were seized

6

by law enforcement authorities on February 7, 1996.

17. In or about early March of 1996, in Miami, Miami-Dade County, defendant KENNETH WILLIAMS delivered cocaine to an individual who in turn transported the cocaine to Tallahassee, Florida, a portion of which was later seized by law enforcement authorities on March 6, 1996.

18. In or about late April of 1996 or early May of 1996, in Miami, Miami-Dade County, defendant MICHAEL HARPER delivered several kilograms of cocaine base, or "crack" to an individual who in turn transported the crack to North Carolina, a portion of which was later seized by law enforcement authorities on May 3, 1996.

19. On or about May 19, 1996, in Miami, Miami-Dade County, defendants WAYNE BAPTISTE and ARTHUR PLESS participated in the shooting death of Moses Brown.

20. On or about November 5, 1996, in Miami, Miami-Dade County, defendant EFRAIN CASADO participated in the shooting death of Tarvis Miller.

21. In or about mid-March of 1997, in Miami, Miami-Dade County, defendant ARTHUR PLESS delivered approximately one-half kilogram of cocaine base, or "crack" to an individual who in turn transported the crack to Jacksonville, Florida, a portion of which was later seized by law enforcement authorities on March 18, 1997.

22. On or about May 23, 1997, in Miami, Miami-Dade County, defendants KENNETH WILLIAMS and EFRAIN CASADO traveled in a stolen car in possession of high powered assault rifles, ski masks and camouflage clothing to rob individuals of drugs and money.

23. On or about June 24, 1997, in Hollywood, Broward County, defendant CHARLTON DARCES applied for a United States passport with DARCES' picture, but in the name of another individual, to meet with cocaine suppliers in Panama to facilitate future cocaine importations for eventual distribution in Miami, Miami-Dade County.

24. On or about September 13, 1997, in Miami, Miami-Dade County, another individual returned from Panama having met with cocaine suppliers to facilitate future drug importations into the Port of Miami and Port Everglades. The individual used the false passport issued to defendant CHARLTON DARCES on this occasion.

25. On or about February 11, 1998, in Miami, Miami-Dade County, defendants EFRAIN CASADO, LEONARD BROWN, LENARD BROWN and JONATHON HAWTHORNE participated in the shooting deaths of Roger Davis and Tyrone Tarver.

26. On or about February 24, 1998, in Miami, Miami-Dade County, defendants LEONARD BROWN and LENARD BROWN shot to death John Davis.

conspiracy. Count 3 accused Williams and Leonard Brown of a conspiracy to import cocaine that, according to the government's evidence, was related to their drug possession and distribution activities charged by the Count 2 conspiracy. Counts 4-15 alleged instances of drug distribution during the timeframe of the Count 2 conspiracy. Count 16 accused six defendants of conspiring to use and carry a firearm during and in relation to the Count 2 conspiracy. Count 17 accused Gibson of maintaining a place for manufacturing, distributing, and using cocaine. Count 1 essentially accused Williams and Casado of masterminding the Count 2 conspiracy, the related importation and firearms conspiracy, and the distribution charges listed in Counts 3, 4, 6, 8, 9, and 10.

The jury returned guilty verdicts as to all defendants on Counts 1, 2, 3, 4, 6, 8, 9, 10, 11, 12, 14, 15, and 16.[4] The defendants appeal from these convictions, and Williams, Casado, Baptiste, Harper, Malcolm Shaw, Pless, and Hawthorne also challenge their sentences. We address each of the defendants' arguments in turn, grouping them whenever possible to avoid repetition.

## II. DISCUSSION

### A. Evidentiary Errors

We first address the defendants' arguments that the district court erred in

---

[4] The government dismissed Counts 5, 7, and 13, during trial. The jury acquitted Gibson on Count 17. After trial, the government dismissed Count 2 with respect to defendant Casado only.

8

admitting twenty items of evidence in violation of Federal Rules of Evidence 802 (hearsay), 404(b) (other crimes, wrongs, or acts), 701 (lay opinion testimony), and 106 (rule of completeness); the Fifth Amendment right against self-incrimination; and the Sixth Amendment's Confrontation Clause. Most of the defendants' claims are grounded in Rules 802 and 404(b), and the Confrontation Clause, and challenge evidence pertaining to violent acts allegedly committed by Williams, Casado, Leonard Brown, Baptiste, Pless, and Hawthorne.

We review a district court's evidentiary rulings for abuse of discretion. United States v. Henderson, 409 F.3d 1293, 1297 (11th Cir. 2005). An abuse of discretion arises when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact. United States v. Frazier, 387 F.3d 1244, 1276 n.12 (11th Cir. 2004) (en banc) (Tjoflat, J., specially concurring). We review preserved evidentiary objections for harmless error. United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999), corrected by 194 F.3d 1186 (11th Cir. 1999). However, when a party raises a claim of evidentiary error for the first time on appeal, we review it for plain error only. United States v. Jernigan, 341 F.3d 1273, 1280 (11th Cir. 2003). Under the plain error standard, "before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to

notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Cotton, 535 U.S. 625, 631-32 (2002) (internal quotation marks and citations omitted).

Further, we must review the prejudicial effect of all evidentiary errors, evaluated under both preserved and plain error standards, in the aggregate. United States v. Labarbera, 581 F.2d 107, 110 (5th Cir. 1978).[5] We will therefore reverse if the cumulative effect of the errors is prejudicial, even if the prejudice caused by each individual error was harmless. United States v. Blasco, 702 F.2d 1315, 1329 (11th Cir. 1983) ("A piecemeal review of each incident does not end our inquiry. We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution."). For convenience's sake, therefore, we defer our cumulative prejudice analysis until the end of this section.

**1. Law**

**a) Hearsay and the Confrontation Clause**

The defendants collectively challenge the admission of fifteen items of evidence on the bases that (1) they were inadmissible hearsay and (2) their admission violated the Confrontation Clause. Hearsay "is a statement, other than

_____

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is inadmissible unless the statement is not hearsay as provided by Rule 801(d), or falls into one of the hearsay exceptions enumerated in Rules 803, 804, and 807.

Moreover, if hearsay is "testimonial," that is, for example, "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Crawford v. Washington, 541 U.S. 36, 52 (2004) the Confrontation Clause[6] prohibits its admission at trial unless (1) the declarant is unavailable, and (2) and the defendant has had a prior opportunity to cross-examine the declarant. See id. at 59, 68. While the Supreme Court has not clarified which statements are in fact "testimonial" it has provided some guidance on the term's meaning. It defined "testimony" as "typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" Id. at 51 (quoting 1 N. Webster, An American Dictionary of the English Language (1828)). Thus, "formal statement[s] to government officers" are generally testimonial. Crawford, 541 U.S. at 51. So is "ex parte in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-

---

[6] "In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. Const. amend. VI.

11

examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." Id. Similarly, "extrajudicial statements … contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," fall within the "core class" of testimony. Id. at 51-52.

"Statements taken by police officers in the course of interrogations" are definitively "testimonial." Id. at 52. As the Crawford Court used the term "interrogation" in the "colloquial" and not "technical legal" sense, statements given in a formal interrogation setting at a police station and witness statements given to an investigating police officer are both considered "testimonial." Id. at 53 n.4 (holding that post-Miranda statement "knowingly given in response to structured police questioning" was testimonial), 58 n.8 (characterizing statement given by victim to an investigating police officer in White v. Illinois, 502 U.S. 346 (1992), as testimonial); see also United States v. Arnold, 410 F.3d 895, 903-04 (6th Cir. 2005) (holding that accuser's 911 call, initial statement to police upon their arrival at the crime scene, and statements made to police a short time later were

testimonial).[7]

Admission of non-testimonial hearsay against criminal defendants is not governed by Crawford, but still violates the Confrontation Clause unless the statement falls within a firmly rooted hearsay exception, or otherwise carries a particularized guarantee of trustworthiness. Ohio v. Roberts, 448 U.S. 56, 66 (1980).[8] A hearsay exception is firmly rooted if, "in light of longstanding judicial and legislative experience [the exception] rests on such a solid foundation that admission of virtually any evidence within it comports with the substance of the constitutional protection." Lilly v. Virginia, 527 U.S. 116, 126 (1999).

**b) Rule 404(b) Evidence of "Other Crimes, Wrongs, or Acts"**

All eleven defendants also challenge the district court's admission of fourteen instances of "other crimes, wrongs, or acts" under Federal Rule of Evidence 404(b), much of which implicated them in attempted and consummated

---

[7] We note that Crawford cautions that "[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse--a fact borne out time and again throughout a history with which the Framers were keenly familiar. This consideration does not evaporate when testimony happens to fall within some broad, modern hearsay exception, even if that exception might be justifiable in other circumstances." Crawford, 541 U.S. at 56 n.7.

[8] We note that while Crawford does supercede Roberts insofar as testimonial hearsay is concerned, the Roberts formulation remains applicable to non-testimonial statements. See United States v. Franklin, 415 F.3d 537, 546 (6th Cir. 2005) (explaining that with respect to non-testimonial statements, the Roberts formulation remains the controlling precedent, under which non-testimonial statements are constitutionally admissible if they "bear independent guarantees of trustworthiness"); United States v. Saget, 377 F.3d 223, 227 (2d. Cir. 2004) (stating that "Crawford leaves the Roberts approach untouched with respect to non-testimonial statements").

13

homicides.  Rule 404(b) forbids the admission of any evidence of "other crimes, wrongs, or acts … to prove the character of a person in order to show action in conformity therewith."  Fed. R. Evid. 404(b).  However, such evidence "may … be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Id. Rule 404(b) is a rule of inclusion.  United States v. Perez-Tosta, 36 F.3d 1552, 1562 (11th Cir. 1994) (noting that "[t]he second sentence of rule 404(b) is a rule of inclusion, and 404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case").  If the prior act evidence is relevant to an issue other than the defendant's character, it may be admissible provided that the government (1) has sufficient proof that the defendant committed the prior act, and (2) can show that the probative value of the evidence is not substantially outweighed by its undue prejudice, and meets the other requirements of Rule 403.  United States v. Miller, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc); see also Huddleston v. United States, 485 U.S. 681, 689-92 (1988).[9]

---

[9] Nevertheless, in this Circuit "evidence of other crimes, wrongs, or acts" falls outside the scope of Rule 404(b) when it is: "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." United States v. Veltmann, 6 F.3d 1483, 1498 (11th Cir. 1993).  This so-called "res gestae" often arises during trials for conspiracies where the "other crimes, wrongs, or acts" describe the co-conspirators' behavior within the scope and in furtherance of the charged conspiracy.  See, e.g., United States v. Jiminez, 224 F.3d 1243, 1249-50 (11th Cir. 2000); United States v. Ramsdale, 61 F.3d 825, 829-30 (11th Cir. 1995).  Although not subject to Rule 404(b), admission of res gestae must still satisfy Rule 403.  United States v. Church, 955 F.2d 688, 700 (11th Cir. 1992).

Extrinsic evidence of other crimes, wrongs, or acts is inherently prejudicial to the defendant. United States v. Beechum, 582 F.2d 898, 910 (5th Cir. 1978) (en banc). "One of the dangers inherent in the admission of extrinsic offense evidence is that the jury may convict the defendant not for the offense charged but for the extrinsic offense." Id. at 914. Additionally, extrinsic evidence "may lead [the jury] to conclude that, having committed a crime of the type charged, [the defendant] is likely to repeat it." Id. (quotation marks omitted). Either inference may be inimical to the long-standing rule that propensity to commit crimes should not be the basis of a conviction.

Moreover, the non-character probity of 404(b) evidence is not absolute, but rather relative to the other evidence in the proponent's case. Id. Thus, we have "generally held that if the extrinsic act requires the same intent as the charged offenses and if these acts are proximate in time to the charged offenses, then the extrinsic act is highly probative." Church, 955 F.2d at 702 (quotation marks omitted). "In its Rule 403 analysis, the trial court should [also] consider . . . the probable effectiveness or lack thereof of a limiting instruction." United States v. Meester, 762 F.2d 867, 875 (11th Cir. 1985).

The probative value of extrinsic evidence also depends on the strength of the government's case concerning the element of intent of the charged crime. The stronger the government's case on intent, the less the extrinsic evidence will add.

United States v. Pollock, 926 F.2d 1044, 1049 (11th Cir. 1991); Beechum, 582

F.2d at 914.  It follows that if intent is undisputed by the defendant, the evidence is

of negligible probative weight compared to its inherent prejudice and is therefore

uniformly inadmissible.  Beechum, 582 F.2d at 914-15 ("If the defendant's intent

is not contested, then the incremental probative value of the extrinsic offense

[offered to prove intent] is inconsequential when compared to its prejudice;

therefore, in this circumstance the evidence is uniformly excluded.").  Finally, we

review the admissibility of evidence under Rule 404(b) for an abuse of discretion.

United States v. Giordano, 261 F.3d 1134, 1140 (11th Cir. 2001).

## 2.  The Defendants' Evidentiary Claims

Having set forth the relevant legal standards, we first discuss each alleged

evidentiary error to determine whether the district court abused its discretion by

admitting the testimony at issue.  Second, in those cases where the district court did

err, we consider whether the errors were sufficiently prejudicial to warrant

reversal.

### a)  Gary Coley Homicide

At trial, Sergeant Singer of the Miami-Dade Police Department (MDPD)

testified that his investigation of an October 1987 shooting that killed Gary Coley

and wounded Steven Jones and Robert Fitzpatrick "revealed" that Williams was

the gunman.  Singer also testified that Steven Jones, who did not testify at trial, had

16

identified Williams as the shooter. Singer added that Williams later pled guilty to an attempted second-degree murder charge arising from the incident. Defense counsel lodged timely hearsay and 404(b) objections.[10]

Singer's statement about what Jones told him is unquestionably hearsay; it has no probative value other than to establish that Williams shot Coley, Jones, and Fitzpatrick.[11] Singer's statements about what his investigation "revealed" are similarly hearsay; even though they do not explicitly paraphrase the words of others, the only conceivable explanation for how Singer discovered this information is through listening to the statements of others. See United States v. Shiver, 414 F.2d 461, 463 (5th Cir. 1969) (stating that a detective's testimony that his investigation "revealed" that a certain car was stolen was "pure hearsay, since he could not have known the facts of his own knowledge."). As the statements do not fall under any of the hearsay exceptions, the district court abused its discretion in admitting them.

Defense counsel did not, however, lodge a timely Confrontation Clause

---

[10] The district court stated before trial that the objections of one defendant would automatically be adopted by the other co-defendants, unless a defendant expressly stated that he or she wanted to "opt out."

[11] Any assertion that this evidence provided "background" for Singer's testimony about Williams' subsequent guilty plea misses the point that the only relevance of Williams' guilty plea is to establish that he did in fact attempt to kill Jones and Fitzpatrick. "Background" evidence of the facts supporting a guilty plea is thus relevant for the same reason the plea itself is relevant – to prove Williams was the shooter, and is thus more likely to have committed the charged crimes. That is precisely what Rules 802 and 404(b) forbid.

17

objection,[12] and so we review this claim for plain error only. The district court

erred under Crawford by admitting Singer's statements because: (1) the hearsay

statements, made by accusers to a law enforcement officer in the course of a

criminal investigation, were "testimonial;" and (2) the defendants had no

opportunity to cross-examine the declarants. See Crawford, 541 U.S. at 58 n.8

(characterizing statement given by victim to an investigating police officer at the

scene of the crime in White v. Illinois, 502 U.S. 346 (1992), as "testimonial").

This error was also "plain." Error is "plain" when, at the time of appellate

review, it is "obvious" or "clear" under current law, even if the law at the time of

trial was settled to the contrary. Johnson v. United States, 520 U.S. 461, 467-68

(1997). Crawford's determination that the accuser's statements to the police in

White v. Illinois were testimonial makes it obvious that admitting Sergeant

Singer's accounts of the accusers' statements in the Coley murder into evidence

---

[12] In fact, the defense did not raise Confrontation Clause objections to any of the contested evidence at trial. Several circuits have held that a hearsay objection does not in itself preserve a Confrontation Clause objection. United States v. Dukagjini, 326 F.3d 45, 60 (2d Cir. 2003); United States v. LaHue, 261 F.3d 993, 1009 (10th Cir. 2001) (trial counsel had raised hearsay objection, but "[w]here a Confrontation Clause objection is not explicitly made below we will not address the constitutional issue in the absence of a conclusion that it was plain error for the district court to fail to raise [it] sua sponte") (quoting United States v. Perez, 989 F.2d 1574, 1582 (10th Cir. 1993) (en banc)); cf. Greer v. Mitchell, 264 F.3d 663, 689 (6th Cir. 2001) (rejecting defendant's argument that "trial court's ruling on hearsay objections were significant enough to implicate the Confrontation Clause"). We have held that an objection properly characterized as either an evidentiary objection or a sufficiency-of-the-evidence objection does not constitute a constitutional objection for purposes of appellate review. United States v. Candelario, 240 F.3d 1300, 1304 (11th Cir. 2001). Thus, defense counsels' hearsay objections are insufficient to preserve an objection on Confrontation Clause grounds.

violated the Confrontation Clause.  Thus, the first two elements necessary to satisfy plain error review are satisfied here.  We consider the remaining two elements (i.e., whether the error affected the defendant's substantial rights and whether it seriously affected the integrity of judicial proceedings) when we later discuss the prejudicial effect of the district court's errors.

Moreover, as the defense contended at trial, admission of this extrinsic evidence also violated Rule 404(b).  Although the government argues that this evidence is relevant to establish Williams' intent, motive, knowledge, and modus operandi in the drug-related offenses, we are unpersuaded.  The Coley murder is unrelated to any of the charged drug- or firearm-related crimes,[13] and predates both of the charged conspiracies and the continuing criminal enterprise.  Although we have recognized a connection between narcotics trafficking and violent crime, see, e.g., United States v. Thomas, 242 F.3d 1028, 1032-33 (11th Cir. 2001) (finding prior drug sales relevant to show defendant's motive in felon in possession charge), the extrinsic evidence must have at least some plausible non-character relevance to

---

[13] We emphatically reject the government's argument that the defendants' uncharged criminal activity is relevant because it tends to show intent, motive, knowledge, and modus operandi to commit one of the twenty-six "overt acts," many of them homicides, alleged in furtherance of the Count 2 conspiracy.  As noted supra, the alleged overt acts are not elements of the Count 2 conspiracy because 21 U.S.C. § 846 does not require one.  Shabani, 513 U.S. at 13.  In other words, the jury could have convicted all eleven defendants on Count 2 even if it had found that they did not commit any of the twenty-six overt acts alleged.  Just because the government places those acts in the indictment does not magically make them elements of the conspiracy crime.  In reality, the admissibility of 404(b) evidence stands and falls on the basis of its relevance to the elements of the charged crime, and nothing else.

the charged conduct to be admissible under 404(b). The evidence never specified what Williams' intent, motive, or modus operandi was in carrying out the Coley shootings, and thus this incident is only relevant to show that Williams is more likely to commit crimes because he has done so in the past, which is exactly the inference that Rule 404(b) forbids.

Moreover, even if this evidence were relevant to show something other than action in conformity with past crimes, any such relevance is substantially outweighed by the evidence's dramatic prejudicial effect. See United States v. Sanchez, 722 F.2d 1501, 1507-08 (11th Cir. 1984) (holding testimony that the defendant, who was charged with conspiracy to import, importation of, and possession of cocaine, killed two people in furtherance of the conspiracy after he received a bad cocaine shipment was inadmissible under Rule 403); see also, Church, 955 F.2d at 702. The district court thus abused its discretion in admitting this evidence.[14]

### b) Domestic Violence Complaint against Williams

The district court permitted Florida State Trooper Rodney Polite to testify that he received a complaint from Williams' girlfriend in 1993 that Williams "had slapped her and beat her up," over the hearsay objections of the defense. The

---

[14] The district court did give a 404(b) limiting instruction as to this evidence, but as the evidence was admitted for an improper purpose, the limiting instruction's effect on the evidence's prejudicial effect is irrelevant to the propriety of its admission.

defendants also raise Confrontation Clause and Rule 404(b)[15] challenges for the first time on appeal.

The district court denied the hearsay objection on the basis that the statement was not offered to prove the truth of the matter asserted. We disagree. The only conceivable probative value of Polite's testimony is to establish that Williams did beat up his girlfriend, and was thus more likely to commit the charged crimes. And because Polite's statement clearly does not fall into any hearsay exception, the district court abused its discretion under Rule 802 in admitting it.

### c) Palmetto Expressway Triple Murder

The government introduced evidence, over a hearsay objection, about a triple homicide committed on March 24, 1995, that it contended was related to Williams' and Casado's drug business. MDPD Detective Juan Capote, who responded to the homicide that night, testified that four men in a red car had been shot on the Palmetto Expressway in Miami by bullets from an AK-47 assault rifle. Three men died; one survived. Capote stated that he later "received information" from an anonymous caller that indicated that Williams, Casado, and Marvin Rogers, an associate of Williams, were involved in the shooting, and indicated that the three victims were "street level narcotics dealers" who had been selling drugs

---

[15]We need not address whether admission of this evidence constituted plain error under the Confrontation Clause and Rule 404(b), as the testimony was obviously inadmissible hearsay not subject to any exception.

on Roger's drug turf. He further testified that the survivor of the shooting told him that Williams and two other men were the gunmen.[16]

The district court explained that it allowed this testimony because it believed that the statements were relevant not to prove their truth, but rather to explain how Capote conducted his investigation.[17] We do not understand this reasoning. Capote's investigation was not a complex endeavor; he responded to a homicide call, examined the scene of the crime, and interviewed witnesses. Nothing the witnesses said shed any additional light on why Capote conducted his investigation in the manner that he did, nor did Capote's investigation turn up any evidence other than eyewitnesses' statements accusing Williams and Casado of committing the homicides. Rather, the only relevancy of the witnesses' statements was to establish that Williams, Casado, and Rogers did in fact commit the homicides. As the statements also do not fall into any hearsay exception, the district court clearly abused its discretion in allowing their admission.

**d) 1992 Miami Strip Club Shootout**

---

[16] The government also admitted photos of the crime scene into evidence.

[17] Statements by out of court witnesses to law enforcement officials may be admitted as non-hearsay if they are relevant to explain the course of the officials' subsequent investigative actions, and the probative value of the evidence's non-hearsay purpose is not substantially outweighed by the danger of unfair prejudice caused by the impermissible hearsay use of the statement. Ryan v. Miller, 303 F.3d 231, 252-53 (2d Cir. 2002); see also United States v. Valencia, 957 F.2d 1189, 1198 (5th Cir. 1992); United States v. Hawkins, 905 F.2d 1489, 1495 (11th Cir.1990); United States v. Love, 767 F.2d 1052, 1063 (4th Cir. 1985); United States v. Lubrano, 529 F.2d 633, 637 (2d Cir.1975).

MDPD Sergeant Alexander Casas testified that he had responded to a reported shooting at the Club Rolex, a Miami-area strip club. He found .40 caliber shell casings, blood, and clothing at the crime scene, but not the victim, who had already been taken to the hospital. However, he stated that he also learned upon his arrival that Williams had tried to shoot someone in the parking lot of the club when his gun jammed, and was shot by his intended victim. Finally, Casas said that he thought it strange that Williams never talked to the police about the shooting, because shooting victims are usually cooperative, and opined that the victim of a shooting would not seek out the police in cases where the victim was the aggressor. The district court overruled defendants' hearsay and Rule 701 objections to this testimony.

Casas' statements about what he learned are unquestionably inadmissible hearsay, as their only probative value is to establish that Williams had attempted to shoot someone, and are not covered by a hearsay exception. The district court abused its discretion under Rule 802 in admitting this evidence.[18]

### e) 1992 Murder of "Ankey"

A witness for the government testified that Williams and Richard Stit killed

---

[18] Appellants argue that Casas' statements concerning Williams' failure to speak with the police about the shooting constitute impermissible lay opinion testimony under Federal Rule of Evidence 701. Even assuming that the district court abused its discretion in admitting this evidence, we do not find its admission sufficiently prejudicial either alone or in concert with other errors to merit reversal of Williams' conviction, as discussed infra.

a member of the rival "Thomas gang" in Virginia, because Williams believed Thomas gang members responsible for shooting Williams' business associates. The defense made no objection to this testimony at trial, but argues on appeal that its admission violated Rule 404(b).

The "Ankey" murder was committed during the scope of and in furtherance of the Count 2 conspiracy. It is so closely related to Williams' participation in the conspiracy that it must be considered "inextricably intertwined" with the evidence of the conspiracy, see Veltmann, 6 F.3d at 1498, and is thus not 404(b) evidence. It also satisfies Rule 403 because it was significantly probative of Williams' modus operandi in his drug transaction — using violence to eliminate his competitors and avenge attacks on his business associates. Admission of this testimony was not an abuse of discretion.

### f) Jetier Homicide

MDPD Officer David Sanchez investigated the 1991 shooting of Willie Jetier, who was hospitalized for a short while before succumbing to his wounds. Sanchez testified that he suspected that Casado and Baptiste were the shooters and, fearing that Jetier would die before having an opportunity to identify the perpetrators, he brought them to the hospital, where Jetier identified them as the men who shot him. The defendants objected on hearsay and 404(b) grounds.

Officer Sanchez's testimony about what Jetier told him is inadmissible

hearsay. Its only probative value was to establish that Casado and Baptiste were the shooters, and did not explain any independently relevant aspect of Sanchez's investigation. Nor does it fall under a hearsay exception.[19] Its admission was thus a clear abuse of discretion.

Finally, Sanchez' testimony is extrinsic evidence under Rule 404(b), as it is not an uncharged offense which arose out of the same transaction or series of transactions as the charged offenses, necessary to complete the story of the charged crimes, nor inextricably intertwined with the evidence regarding the charged offenses. Moreover, it is only relevant to prove Casado's and Baptiste's bad character and to show their action in conformity therewith, which Rule 404(b) clearly prohibits. It was thus an abuse of discretion to admit it into evidence.

### g) Amoco Double Murder

MDPD Detective Jeff Lewis testified about his investigation of the murder of Roger Davis and Tyrone Tarver at an Amoco station on February 11, 1998. Although he did not witness the shootings, Lewis told the jury that eyewitnesses had told him the following during his investigation:

Davis and Tarver arrived at the Amoco station at about the same time, in

---

[19] The statement was not excepted from the general prohibition against hearsay as a "dying declaration" under Rule 804(b)(2) because the government produced no evidence establishing that Jetier made his statement "believing that [his] death was imminent." Nor is it classified as a non-hearsay statement of identification under Rule 801(d)(1)(C), because Jetier did not testify at the trial and was not subject to cross-examination concerning that statement.

separate cars. Shortly thereafter, a blue-green Nissan Altima drove into the station after them. Two men clothed in camouflage, ski masks, and bulletproof vests exited the car toting AK-47s and began shooting at the two men.

Davis and Tarver fled their assailants, but to no avail. The gunmen hunted Davis down near a fence, and shot him while he was apparently trying to surrender. After Davis collapsed, the shooter pressed the gun barrel to his head and shot him again. Tarver, on the other hand, was gunned down as he fled across the street, but did not die immediately. Instead, he lay on the road, crying out in agony that "it burned."[20] At the scene of the crime, Lewis found 43 spent AK-47 shell casings on the ground, in locations indicating that the gunmen tracked their victims across the Amoco station premises as they fired. One-and-a-half blocks away, police also recovered the Nissan Altima, and found two AK-47 assault rifles, four ski masks, a "skully,"[21] and some tools that Lewis opined had been used to start the vehicle, which had been reported stolen. Police also discovered that the stolen car's owner had his or her cellular telephone taken along with the car. A call made from that phone after the theft had occurred was traced to the girlfriend of Corey "Fish Grease" Murcherson, an associate of Williams.

Lewis then stated that another "source" informed him that a rented white

---

[20] At this time the government admitted graphic photographs of the crime scene.

[21] Witnesses described a "skully" as a knit stocking cap.

26

Toyota Camry had also been involved in the Amoco shooting. The car was traced to a Miami rental outlet. The rental paperwork listed one Richard Stit as a driver, who, Lewis told the court, the United States Attorney's Norfolk office identified as an "enforcer" for Williams. Police later located the Camry, which had been destroyed by fire.

Lewis continued, stating that unnamed witnesses identified one passenger in the Altima as a heavyset black male, over 6' tall, with long, flowing dreadlocks, and the driver as a shorter black male with a medium build. He said that another eyewitness, Mario Frazier, told him that the car's driver was Casado.[22] He also detailed the contents of a Miami Herald article, admitted into evidence, describing one gunman as a 25-30 year-old, 250-lb black male, 5' 9" to 6' tall, with a light complexion, and a long haircut — a description somewhat consistent with photos of a man Lewis identified as Hawthorne. It described the other gunman as a 20-25 year-old, 160-175lb black male, 5' 9" - 6' tall, with a light complexion and Afro haircut. Hawthorne's involvement, Lewis also testified, was corroborated by an interview he had with a prisoner, Kevin Bovian. Bovian allegedly told Lewis that Hawthorne said he was the driver of the rental car, that he cut his dreadlocks after the press coverage describing the gunmen, and that the shooting was in retaliation for a shooting in which Hawthorne was wounded the month before.

---

[22] Casado is a Hispanic male.

27

According to Lewis, Jesus Wilson also told him that he saw Leonard and Lenard Brown inside the Altima. Wilson claimed that the Altima had been hidden at the house of a Williams' associate, earlier on the day of the shooting, along with the bulletproof vests and AK-47s Wilson said were used to kill Davis and Tarver. Lewis said that Wilson told him that the twins asked him to buy dark, full-face ski masks for them, because they did not want to draw attention to themselves by making such a purchase. However, Wilson contradicted Bovian's statement that Hawthorne was a gunman, telling Lewis instead that the twins killed Davis and Tarver. Lewis concluded by opining to the court that "based on his investigation," he thought that the Amoco murders were the result of a turf war between the "Boobie boys" and a rival gang called "Vonda's gang."

Finally, Lewis told the court that Williams' friend and associate Corey Murcherson, was killed shortly after the Amoco double murder in which he had allegedly participated. Lewis testified that he believed Williams and Brown thought Murcheson was a liability after the Amoco murder and sought to have him killed. Lewis' speculation about Williams' motives became more convincing after Murcherson's former lawyer, Karen Mills-Francis, testified for the defense that on November 16, 2005, Murcherson admitted to her that he was in fact a gunman in the Amoco murders. The defendants raised a hearsay objection to this evidence at trial, but also argue for the first time on appeal that its admission violated Rule

28

404(b).

Lewis' recollection of what eyewitnesses told him about the murder is inadmissible hearsay, as are his statements about what Bovian and Wilson told him. They were offered to establish their truth — who killed Davis and Tarver, and how — and do not fall into any hearsay exception. The district court thus abused its discretion in allowing this testimony.

The Miami Herald articles are also inadmissible hearsay, as they are relevant primarily to establish the truth of their contents — the identity of the gunmen.[23] The articles might be permissible for the non-hearsay purpose of establishing that the descriptions of the gunmen had been made public, but in the absence of any non-hearsay evidence concerning the description of the gunmen, the prejudice stemming from the hearsay use of the evidence substantially outweighs the articles' probative value to establish the murders' publicity. Thus, their admission constitutes an abuse of discretion under Rule 802.

Lewis' statement about the white Camry, on the other hand, was not hearsay because it was probative to establish why he procured the car's paperwork, and was properly admitted. Nonetheless, his account of what the U.S. Attorney's office told him about Richard Stit was offered to prove the truth of its contents, and

---

[23] In fact, the articles are likely a reporter's account of what eyewitnesses reported; in other words, double hearsay forbidden by Rule 805.

is inadmissible hearsay, the allowance of which was an abuse of discretion.

Finally, the entire testimony concerning the Amoco murders and Murcherson's murder plainly violates Rule 404(b).[24] All three killings occurred outside the temporal scope of all of the charged crimes, including the Count 2 conspiracy, and there is hardly any evidence, beyond Detective Lewis' rank speculation, linking the shootings to any of the charges in the indictment. Its only real probative value is to establish the criminal propensities of those involved. And even if this evidence did have some probative worth, the details of the Amoco double homicide are so chilling that its prejudicial impact substantially outweighs any such probative value. The admission of this evidence thus constitutes error that is plain.[25] See United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003) ("It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it."); United States v. Gore, 298 F.3d 322, 324-25 (5th Cir. 2002) (holding that error was "plain" when the district court's ruling was obviously

_____

[24]We address here only the first two elements of plain error review: (1) admission of the testimony concerning the Amoco murders was error under Rule 404(b); (2) that error is now plain. We address the remaining two elements in our discussion of the prejudicial effect of the district court's errors.

[25]As noted above, we reserve our discussion of the remaining two elements of plain error review (i.e., the impact the evidence had on the defendants' substantial rights and on the integrity of judicial proceedings) as part of our prejudice discussion, infra.

contrary to the text of a federal statute).

In sum, admission of this evidence was an abuse of discretion under Rule 802, and represented an error that was plain under Rule 404(b).[26]

### h) Benny Brownlee Murder

The government's case accused Williams and other unnamed individuals of the 1994 murder of Benny Brownlee, allegedly carried out in retaliation for the murder of Williams' associate and friend Gary Dukes. Dukes was killed in a drive-by shooting while at a barbershop run by Jesus Wilson, a drug dealer and barber who bought cocaine from Williams and Harper. Johnny Hankins, a Williams associate who was also shot in the drive-by, testified that Williams told him that Williams and Marvin Rogers avenged Dukes' murder by killing a member of the Thomas gang, and that Harper had driven the car they used in committing the murder.

The government alleged that this member of the Thomas gang was Benny Brownlee, who was killed hours after the Dukes killing.[27] The MDPD detective who had responded to the Brownlee homicide, Gus Borges, gave a detailed account

---

[26] Although Lewis' statements about the white Camry and his statements about what he observed at the scene of the crime were not hearsay, these statements would have been nonsensical and irrelevant under Rule 401 if considered separately from the inadmissible hearsay, and thus the jury never would have been permitted to hear them out of context. Moreover, admission of these statements still plainly violated Rule 404(b).

[27] Photos of Brownlee's body were admitted into evidence over objection.

31

of the killing on the basis of statements he took from three eyewitnesses. He said that he learned from one eyewitness, Marlin Randal, that men in a beige Honda shot Brownlee as he fled from his attackers. Randal then reportedly said that Brownlee fell "on the ground and defenseless, [and] two subjects walked up to him and continued shooting him." This commentary, Borges stated, was confirmed by two security guards present at the shooting. Moreover, he testified that the doctor who performed Brownlee's autopsy classified the death as a homicide. There was no evidence that these three eyewitnesses were unavailable to testify at trial.

Borges also found a beeper at the Brownlee crime scene that had telephone numbers from received calls stored in its memory. Police called the stored numbers and stated that the persons who answered the phone told him that they had paged the beeper trying to reach Marvin Rogers. Borges further testified that he "learned" that Marvin Rogers was part of a "group operating in the Carol City area" known as the primary street-level drug dealers in that area. He concluded by telling the jury that Williams, Rogers, Raye, and Bernard Shaw emerged as primary suspects in the slaying, but that there was never sufficient evidence to arrest anyone for the crime. The defense raised a hearsay objection to this evidence at trial.

Although Borges' testimony about the recovered beeper and the numbers it contained remain unobjectionable, Borges' testimony about what others told him

32

or about what he had "learned" in the course of his investigation is only relevant to establish its truth, that Williams, Rogers, Raye, and Bernard Shaw killed Benny Brownlee. The fact that it explains what Borges did in the course of his investigation is immaterial, because Borges' investigation is only relevant to prove the very same impermissible thing — that these men in fact killed Benny Brownlee. Likewise, Borges' testimony that Williams, Rogers, Raye and Bernard Shaw emerged as the primary suspects in the shooting itself remains inadmissible hearsay, as it is founded on the hearsay statements of others. The statements are therefore hearsay, and because they do not fall into any hearsay exception, the district court abused its discretion in admitting them.

### i) Fatso and Hollywood Murders

About one month after the Brownlee homicide, two more Thomas gang members were murdered: Walter "Fatso" Betterson and Derrick "Hollywood" Harris. Betterson's mother and Harris' father both testified that their children had told them shortly before they were shot that they were having problems with Williams and feared that Williams was going to kill them.

However, the government introduced other non-hearsay evidence at trial linking Williams and Casado with the murders. Williams' friend and associate Johnny Hankins testified that Williams told him that Betterson and Harris had killed a witness to the Dukes murder, and that Williams, Casado, and Marvin

33

Rogers had killed them in revenge. Hankins' testimony was corroborated by Betterson's neighbor Johnny Hampton. Hampton testified that he saw a Chevrolet Impala chase Betterson's car into his neighborhood. Betterson's car crashed into a pole on the side of the road near his house, and the Impala pulled up alongside it. Someone inside Betterson's car got out and ran, pursued by an occupant of the Impala. Immediately afterwards, three men arrived in a Delta '88. Two passengers emerged, fired shots into Betterson's automobile, and then fled the scene in the Delta. Minutes later, Hampton approached Betterson's car and saw two bodies in the car, later identified as Harris and Betterson. Hampton further identified Williams and Leonard Brown as two of the shooters from the Delta '88. The defendants raised a hearsay objection at trial, and also raise a Rule 404(b) challenge for the first time on appeal.

The parents' statements about what their children told them are hearsay, but are excepted as present sense impressions under Rule 803(1) or as statements expressing then-existing mental, emotional, or physical condition under Rule 803(3). The district court thus did not abuse its discretion in allowing this testimony.

Moreover, the parents' testimony is not 404(b) evidence because it is inextricably intertwined with the evidence regarding the charged offense. See Veltmann, 6 F.3d at 1498. Evidence at trial tied these murders to Williams' feud

34

with the rival Thomas gang and the Thomas gang's murder of Gary Dukes, which in turn was part of the prosecution's case against the defendants in the Count 2 conspiracy. Moreover, it satisfies Rule 403 because it is significantly probative of the defendants' modus operandi in their drug business. The admission of this testimony was thus not error under Rule 404(b), much less plain error.

## j) Colors Apartment Triple Murders

Detective Simmons' testimony also linked Pless to the 1995 triple murder of Otis Green, Green's girlfriend Alicia, and Alicia's five-year-old son Mikie, at the Colors Apartment complex in Miami. Green was a small-time drug dealer who sold at the Colors complex, which was considered his "spot." However, Pless also sold drugs there, as did David Pagan, Pless's supplier and an associate of Casado. Witnesses testified that a dispute had arisen between Pagan and Green, and that Pagan had put a hit out on him. Pagan himself testified that Pless had engaged in a shootout with Green's workers at the Colors complex a few months before the murders.

Brian Gibson, a Colors resident who was with Green, Alicia, and Mikie at the time of the shooting, testified that they were parked near the Colors complex when men in ski masks approached the car with large guns and opened fire, killing everyone but him. He also stated that earlier that night he had seen Casado and Baptiste around the Colors complex, and had seen Pless's truck nearby.

35

Detective Simmons testified that he learned from Anthony Brantley that Pless, Casado, and Johnson had planned and carried out the murders. Brantley ostensibly told Simmons that Pless solicited him to drive the getaway car. Simmons stated that Brantley said he met Pless and Johnson at Casado's warehouse, where they retrieved a stolen car and equipped themselves with assault weapons, dark clothes, and bulletproof vests, and then carried out the killings while Casado watched from a distance.

The government also introduced into evidence a photo of a tattoo Pless had depicting a young boy praying over a crucifix-shaped tombstone engraved with the letters "RIP" that read, "Dear God Can You Save Me." Simmons said that Pless had told him he got this tattoo after the Colors murders to deflect suspicion that he had been involved.

The defendants did not raise an objection to this testimony at trial, but now argue that admission of Anthony Brantley's statements violated Rule 802 and the Confrontation Clause. Admission of the statements did plainly violate the hearsay rule.[28] Simmons' testimony was clearly admitted for its truth, and concerns statements Brantley made in the course of a police interrogation — in this case, an

---

[28] Because we determine that this testimony was inadmissible hearsay, we need not reach defendants' alternative argument that the testimony violated their rights under the Confrontation Clause.

interview with Detective Simmons as part of a criminal investigation.[29]

However, it is apparent from the record that counsel for Arthur Pless invited this error while attempting to undermine the credibility of Simmons' investigation. During cross-examination, Pless's attorney asked Simmons whether Brantley was among the "quality people" that Simmons had relied on in his investigation of the murders and subsequent questioning of Pless:

Q: And Anthony Brantley, Cedrick's brother, that's the word of another person upon whom you were getting ready to interrogate my client to determine if he was going to incriminate himself in the triple homicide over there in the Colors apartments of Otis Green, his girlfriend, and Michael Frazier, correct?

A: What was the first part of your question?

Q: Anthony Brantley is the person upon whom you are relying for your information that you got before my client surrendered and you started talking to him about that homicide?

A: In part. Anthony Brantley was a young man recruited by Efrain Casado, Arthur Pless and Benjamin Johnson to drive a vehicle. He was the getaway driver in the Colors apartments complex in which the little boy was killed along with his mother. He drove the vehicle and provided sworn testimony before the grand jury which was corroborated in every respect through our investigation, and others. It was not totally based on one person's testimony, sir.

---

[29] Although the available record is essentially silent as to the details of Brantley's "interview," his involvement in the murders and the confessional nature of his statements indicates that the questioning was likely more than casual. Moreover, in examining Simmons at trial, counsel for both the defense and the government emphasized the overlap between the interview statements and Brantley's "sworn" (i.e. grand jury) statements, for which Brantley was granted immunity from prosecution.

Q: And Anthony Brantley didn't get arrested or charged with it even though he claimed to you under sworn testimony that he was the driver, that he was taking him to and from a hit where these people were killed. He wasn't arrested and charged or indicted downtown to stand trial for first degree murder and look at death in the electric chair or a lethal injection now, was he?

A: No, sir.

Counsel also noted that Anthony Brantley had recently been released from jail.

On re-direct examination, Detective Simmons related that Anthony Brantley had spoken to him in the course of the investigation, and had testified before a grand jury, both times describing his involvement in the Colors murders. According to Simmons, Anthony Brantley had confessed that he was recruited by Casado to assist in the murder of Otis Green, and had driven the car from which Johnson and Pless emerged before committing the murders, and in which Casado, Baptiste, Johnson and Pless apparently escaped after the murders.

"[I]t is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party. The doctrine of invited error is implicated when a party induces or invites the district court into making an error. Where invited error exists, it precludes a court from invoking the plain error rule and reversing." United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir. 2005) (citations and internal quotation marks omitted); United States v. Martinez,

38

604 F.2d 361, 366 (5th Cir. 1979) ("The accepted rule is that where injection of allegedly inadmissible evidence is attributable to the action of the defense, its introduction does not constitute reversible error .") (quoting United States v. Doran, 564 F.2d 1176, 1177 (5th Cir. 1977)). Moreover, a defendant can "invite" non-responsive testimony when he insists on pursuing a line of questioning after it becomes apparent that further cross-examination will elicit potentially damaging testimony, and fails to object to the non-responsive answer when it is given. See id. (finding non-responsive testimony invited when counsel "pursued his questioning until he dragged the prejudicial statements out of the witness").

It can be fairly said that Pless's counsel elicited the Anthony Brantley testimony from Simmons on cross. Pless's counsel specifically referred to "sworn testimony" in which Brantley supposedly stated that "he was the driver, that he was taking him [Pless] to and from a hit where these people were killed." He also did not object when Simmons gave his non-responsive answer. The re-direct testimony merely elaborated on Simmons' response to this question, which presented the basic outline of the Brantley statement. Thus, Pless cannot now complain about the district court's error.

However, the other defendants may still fairly object to the introduction of this testimony on appeal, as the errors of Pless's counsel are not their own, and they in no way were responsible for Simmons' testimony on cross. Moreover, any

39

objection that they could have made on redirect was foreclosed, as the prosecutor was entitled to elaborate on the information yielded in cross. However, because they raised no objection at the trial court, their claims are subject only to review for plain error. Simmons' testimony that Brantley told him that Casado and Johnson carried out the murders was inadmissible hearsay. That error satisfies the first two prongs of the plain error test. We reserve our discussion of the remaining two prongs for our discussion of prejudice.

### k) Johnny Belliard Murder

The government's case also connected Pless to the murder of Johnny Belliard, a drug dealer who had been threatening to steal money and drugs from Pless. MDPD Detective David Simmons told the jury that he worked on a task force investigating homicides "that was [sic] committed by members of the Boobie boys." He testified that Cedric Brantley, an associate of Pless's who sold drugs for him in Pensacola, told him in a prison interview that Pless and Casado hired Brantley's brother Anthony to kill Belliard.[30]

The defense did not object to this testimony at trial but now argues that admission of the statements violated Rule 802 and the Confrontation Clause. We

---

[30]Simmons' testimony was confirmed by Cedric himself, who testified on Pless's behalf and stated that Casado and Baptiste were nearby when Pless solicited Anthony to carry out the murder. Cedric also testified that his brother told him that after killing Belliard, Anthony returned to Casado's warehouse where he met up with Casado and Johnson.

therefore review the district court's decision for plain error only.[31] The statements are plainly hearsay; they were made by an out-of-court declarant and their only probative value is for their truth. In sum, admission of this evidence violated Rule 802; that error is now plain.[32]

**l) 1997 Car Chase and Robert Sawyer Shooting**

Robert Sawyer was a drug dealer whose business interests sometimes conflicted with Williams' and Casado's. At trial, Jesus Wilson testified that Sawyer had threatened to kill both Williams and Casado over a drug dispute, and that Casado had returned the threat. Later, Sawyer shot, but did not kill, Casado outside Casado's house. Wilson also testified that he, Williams, and others had learned that Sawyer had killed Marvin Rogers, Williams' associate who had participated in the clashes with the Thomas gang. In response, Williams placed a price on Sawyer's life.

Officer Ariel Saud testified that on March 23, 1997, he had attempted to stop a black Honda in the Overtown section of Miami. The car fled, prompting a car

---

[31] The government asserts that this error, like admission of Simmons' testimony about Pless and Johnson's involvement in the Colors triple murder, was invited. However, it does not appear that Pless's counsel introduced the content of the objectionable statement itself, and did not invite the particular error of which Pless now complains.

[32] We reserve discussion of the remaining two elements of plain error review for our discussion of prejudice. Moreover, because admission of this testimony was error that was plain under Rule 802, we need not address defendants' additional argument that this testimony was plain error under the Confrontation Clause.

chase. Saud testified that he saw weapons being tossed from the car, and that eventually the occupants of the car fled on foot. Saud and fellow Officers Miguel Rodriguez, Steven Walthen, and David Sanchez testified that they pursued the fleeing suspects and eventually captured Williams, Casado, and James Deleveaux, a Williams associate.[33] The police found Williams behind a woodpile, and Casado and Deleveaux in the shower of a nearby residence.[34] The officers testified that the owners of the properties where the three men were found said that they did not have permission to be there. Various weapons, including assault rifles, as well as camouflage clothing and armored vests were recovered from the scene. Rene Texidor, Casado's friend, testified that Williams, Casado, and Deleveaux had been on their way to kill Sawyer when they were captured.

Jesus Wilson also testified that in February 1998, he had been in an apartment with Williams, Casado, Lenard Brown, Roshawn Davis, and others, who had assembled weapons and were planning to kill Sawyer. Later, Wilson said, Lenard Brown and Roshawn Davis told him that Lenard, Williams, and Casado had shot Sawyer from their car while traveling next to him on the highway, but that Sawyer survived. The defense raised hearsay and 404(b) objections to this

---

[33] Officer Sanchez also testified that he recognized Casado from when he had arrested him for the Jetier shooting in 1991.

[34] Williams was arrested on charges of grand theft auto, fleeing to elude a police officer, and resisting arrest.

evidence at trial.

Wilson's statements relating what Lenard Brown and Roshawn Davis told him are not hearsay because under Rule 801(d)(2)(E) they are co-conspirator statements made during the course and in furtherance of the Count 2 drug conspiracy. However, the officers' testimony about statements made by the owners of the properties where Williams, Casado, and Delevaux were found are hearsay, and do not fall into a hearsay exception. Their admission therefore was an abuse of discretion. However, their admission did not violate the Confrontation Clause. The statements were not "testimonial" under Crawford because there is insufficient evidence to say that they were accusatory in nature. There is no indication as to whether the declarants knew that their statements would be used at trial later. Roberts therefore governs their admission. Because the details of the surrounding testimony make it almost impossible for the owners' statements to have been false, the statements carry a particularized guarantee of trustworthiness, and their admission does not violate the Confrontation Clause.

Finally, we need not analyze whether admission of this evidence violated 404(b) because none of it is "extrinsic." It clearly concerns an "uncharged offense which arose out of the same transaction or series of transactions as the charged offense." See Veltmann, 6 F.3d at 1498. The dispute with Sawyer arose out of the defendants' involvement in the Count 2 drug conspiracy. Moreover, the testimony

43

does not pose a significant enough risk of unfair prejudice to substantially outweigh its probative value in demonstrating the modus operandi of the defendants' drug business. Its admission was thus not an abuse of discretion.

In sum, only admission of the statements by the property owners that Williams and Casado lacked permission to be on their land was an abuse of discretion under Rule 802.

### m) 1997 Armed Robbery

MDPD Officer Steven Waltham and Detective David Richards testified that a stolen ATM card and checkbook were found in the black Honda used by Williams, Casado, and Delevaux in the March 23, 1997 car chase. Detective Richards stated that several months earlier, the owner of the ATM card and checkbook had reported that she had those items stolen from her at gunpoint, by someone she later identified in a photographic lineup as Williams.

The district court allowed this testimony over a hearsay objection, believing that it was not hearsay because it was a statement of identification. Rule 801(d)(1)(C) does state that statements of "identification of a person made after perceiving the person" are not hearsay, but only if the declarant testifies at trial and is subject to cross examination concerning the statement. See, e.g., United States v. Brewer, 36 F.3d 266, 271 (2d. Cir. 1994) ("Under Rule 801(d)(1)(C), a statement of prior identification may be received in evidence only if the declarant

44

testifies at trial and is subject to cross-examination concerning the prior identification.") (internal quotation marks omitted).  The victim of the theft never testified at trial, so the testimony is hearsay.  Since no hearsay exception applies, its admission was an abuse of discretion.

## n)  Everett Cooper Murder

The government's case  accused Pless and Casado of killing small-time drug dealer Everett Cooper (a.k.a. "Charlie Paul") in September 1994.  Cooper dealt drugs at the Silver Blue Lakes apartment complex in Miami, where Pless also sold cocaine.  Detective Michael Malott, who investigated the murder, stated that eyewitnesses told him that a man got out of a Lincoln Town Car and shot Cooper with a chrome revolver.  Malott further stated that Casado "had been known" to drive a blue Town Car, and that shell casings found at the scene matched those found at the scene of the Colors triple murder.[35]  The defense lodged a hearsay objection at trial, and also raises a 404(b) challenge for the first time on appeal.

Malott's testimony about what eyewitnesses told him and about what Casado "had been known" to do is inadmissible hearsay because it is only relevant for its truth — to establish that Casado and Pless were responsible for Cooper's death.  As no hearsay exceptions apply, admission of this testimony was an abuse

---

[35] A bloody photo of Cooper's body was also admitted into evidence.  However, Malott's testimony was bolstered by David Pagan, who testified that Pless admitted to killing Cooper.

of discretion.

However, admission of Malott's testimony did not violate Rule 404(b), much less constitute plain error, because like the government's evidence concerning the "Ankey" murder, evidence that Pless and Casado killed a rival drug dealer during the scope of the Count 2 conspiracy is inextricably intertwined with the evidence of their involvement in that conspiracy. See Veltmann, 6 F.3d at 1498. And although the evidence is certainly prejudicial, it still satisfies Rule 403 because the danger of unfair prejudice does not substantially outweigh its significant probative value in establishing Pless's involvement in the Count 2 drug conspiracy.

### o) America's Most Wanted/Crimestoppers

Deputy U.S. Marshal Michael Moran testified that Williams had appeared on the television programs Crimestoppers and America's Most Wanted around 1998. The defense made an objection at trial based on hearsay, and Rules 403 and 404(b).

Although the government offered this testimony to provide background on Williams' status as a fugitive, it is nonetheless inadmissible hearsay. The only relevance of the testimony is to show that Williams was, in fact, wanted by law enforcement. As it falls under none of the hearsay exceptions, it was an abuse of discretion to admit it into evidence.

Finally, although this evidence may be "inextricably intertwined with the

46

evidence regarding the charged offense" since it demonstrates that Williams was trying to elude capture for the charged offenses and thus tends to show his cognizance of his own guilt, see People v. Slater, 268 A.D.2d 260, 260 (N.Y. App. Div. 2000), it does not satisfy Rule 403 in this case.[36] While this evidence has virtually no probative value, it is incredibly and unfairly prejudicial – essentially telling the jurors to believe that Williams is guilty of the charged offenses because he appeared on two well-known television programs featuring individuals that police consider responsible for committing crimes.[37] See Ford v. Curtis, 277 F.3d 806, 811 (6th Cir. 2002) (finding "references to the F.B.I's Ten Most Wanted List and to America's Most Wanted" in the government's case constituted 404(b) evidence that was "of nominal relevance and prejudicial"); Wilding v. State, 674 So. 2d 114, 119 (Fla. 1996), overruled on other grounds by Devoney v. State, 717 So. 2d 501 (Fla. 1998) ("The fact that [the defendant] was the subject of [the] widely viewed television program [America's Most Wanted] clearly was irrelevant and highly prejudicial."). Permitting the admission of this evidence was thus an abuse of discretion.

**p) 1997 Staged Drug Rip-Off**

---

[36] Even though inextricably intertwined evidence is not subject to Rule 404(b), it must still satisfy Rule 403. Church, 955 F.2d at 700.

[37] America's Most Wanted is "a nationally syndicated television show that profiles unsolved crimes and solicits assistance from the public in identifying and tracking down the suspects portrayed on its episodes." United States v. Henderson, 241 F.3d 638, 642 (9th Cir. 2000).

47

Government witnesses testified that defendant Baker, an MDPD officer, had been hired by Williams, Shaw, and Harper to steal drugs and money from their customers. MDPD officers also testified that Baker participated in an unrelated drug rip-off for a different drug dealer in 1997 that had been staged by the MDPD's Internal Affairs Department. In particular, Detective Joe Gross, who supervised a surveillance operation against Baker, testified as to what other officers who were watching Baker told him over police radio about Baker's actions. The defense made a hearsay objection to Gross' testimony at trial, and raises a 404(b) challenge to its admission for the first time on appeal.

We need not reach the defendants' 404(b) contentions, as Gross' statements were inadmissible hearsay. Although they were relevant to explain how Gross conducted his sting operation, their primary probative value was to prove that Baker was accepting money in return for helping drug dealers rip off their customers. The testimony does not fall into any hearsay exception, and thus its admission was an abuse of discretion.

### q) Threats Made By Williams, Baptiste, and Brown to Witnesses in Holding Cells

Errol Sawyer, an acquaintance of many of the defendants, testified for the government that Leonard Brown, Baptiste, Shaw, and Williams threatened him while he was in a holding cell waiting to testify. Sawyer said that Brown told him

that "black grease-ass kid's mother is sitting over there [in the courtroom] with his kid" and to "be careful about your son 'cause we're going to get him on the streets and [fuck] him." He said that Shaw asked him why he let the "white people" make him start talking, that Williams made "sly remarks," and that both said, "You ain't going to get forty years off of me." Witness Reggie White testified that he also overheard Williams and Brown make threatening remarks to Sawyer. The defense objected to this testimony on Rule 404(b) grounds.[38]

Although prejudicial, "[c]ourts may consider evidence of threats to witnesses as relevant in showing consciousness of guilt" under Rule 404(b). United States v. Gonzalez, 703 F.2d 1222, 1223 (11th Cir. 1983). However, "[b]ecause the potential prejudice from death threats may be great, the government must have an important purpose for introducing the evidence in order to satisfy the

---

[38] As an initial matter, we note that these threats are not acts committed in the course and in furtherance of the charged conspiracies, such that they would be admissible against all of the defendants. We cannot infer from the threats that a subsidiary conspiracy to injure Sawyer, his friends or his family or to prevent Sawyer from testifying was consummated over two years after the underlining criminal enterprise was dissolved. See generally United States v. Magluta, 418 F.3d 1166, 1178-79 (11th Cir. 2005) ("Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators.") (quoting Grunewald v. United States, 353 U.S. 391, 402 (1957)). Pursuant to the Third Superseding Indictment, the conspiracies charged in Counts 1, 2, 3, and 16 continued through January 1998, while the alleged threats occurred on March 1, 2000. Moreover, evidence did not support the proposition that the original conspiracy included a "subsidiary conspiracy" to injure Sawyer, his friends or his family or to prevent Sawyer from testifying two years after the conclusion of the original conspiracy. See Magluta, 418 F.3d at 1179. Accordingly, the threats were not in furtherance of the underlining conspiracy.

balancing test of Rule 403." Id. (internal citation omitted). We have held that a trial court did not abuse its discretion when it allowed a government informant to testify in a multi-defendant trial that one defendant threatened his life two weeks before trial, when the court had given a limiting instruction to the jury to consider the testimony only with respect to the defendant who had made the threat. Id. Although we realize that the district court has wide discretion in admitting evidence, id. at 1224, it is clear to us that the district court abused that discretion in allowing the evidence of the threats in this case, to the extent that it refused to give such a limiting instruction to the jury commanding them to only consider the evidence against Shaw, Williams, Leonard Brown, and Baptiste, in light of the extreme prejudice that such evidence can create with respect to other co-defendants. See id. at 1223-24 (presence of limiting instruction important in determination that district court did not abuse its discretion in admitting this evidence with respect to the defendants that did not make threats).

The district court therefore abused its discretion in admitting this evidence as to Casado, Harper, Pless, Johnson, Hawthorne, Gibson, and Baker. As to the four defendants that actually made the threats, whether admission of this testimony was proper remains a close call, but we ultimately conclude that the district court did not abuse its discretion in admitting it as to Williams, Shaw, Baptiste, and Leonard

50

Brown.

### r)  Gibson's 1980s Drug Sales

Several government witnesses testified that Gibson, with the help of her twin sons, engaged in many drug transactions in Overtown in the 1980s, before the time period covered by the Count 2 conspiracy.  These witnesses said that Gibson had a "spot" in Overtown near her house where she would give small quantities of cocaine and heroin to small children, to sell on the street for her.  Leonard and Lenard Brown, who at that time were still in their early teens, allegedly helped Gibson pack cocaine, cook it into crack, and sell cocaine and heroin on the street along with other children.  The defense raised a 404(b) objection at trial.

This evidence of Gibson's drug sales before any of the charged conduct in the indictment is "extrinsic" evidence whose admission is regulated by Rule 404(b).  Under that Rule, this evidence was probative of Gibson's intent on the Count 17 charge of knowingly maintaining a place for the purpose of manufacturing, distributing, and using drugs.  United States v. Cardenas, 895 F.2d 1338, 1342 (11th Cir. 1990) (holding that "when a defendant charged with conspiracy enters a not guilty plea, he makes intent a material issue in the case and imposes a substantial burden on the government.  Thus, the government may introduce extrinsic offenses which qualify under 404(b) to prove defendant's state

51

of mind, unless defendant takes affirmative steps to remove the issue of intent from the case.") (internal quotation marks and citations omitted). Thus, the district court did not abuse its discretion in admitting testimony concerning Gibson's extrinsic drug sales.

## s) Reference to Pless's Post-Miranda Silence

Pless raises a Fifth Amendment due process challenge to Detective Simmons' testimony regarding Simmons' post-arrest questioning of Pless regarding the Everett Cooper murder and Pless's refusal to answer certain questions. The following exchange ensued:

| | |
|---|---|
| Q [AUSA]: | Did there come a time that your interview of Mr. Pless terminated, told you he didn't want to talk to you any further? |
| A [SIMMONS]: | Yes. But prior to doing so, he mentioned – |
| MR. MATTERS:[39] | Objection. I would like to preserve that for a sidebar. |
| THE COURT: | Sustained. |
| THE WITNESS: | Yes, sir. |
| Q: | What subject matter were you relating to him when the interview ended? |
| MR. MATTERS: | Objection, Judge. |
| THE COURT: | Overruled. |
| THE WITNESS: | We started to inquire of Mr. Pless as to his involvement in homicides. |
| Q: | And was the interview ended at that time? |
| A: | Yes, sir. |

Counsel for Pless moved for a mistrial, arguing that the testimony was a

---

[39] Mr. Matters is Pless's counsel.

direct reflection upon Pless's Fifth Amendment right against self-incrimination. The court denied the motion.

Use of the defendant's silence at the time of arrest and after receiving Miranda warnings in an effort to impeach him at trial violates the Due Process Clause and its guarantee against fundamental unfairness. United States v. Miller, 255 F.3d 1282, 1285 (11th Cir. 2001) (citing Doyle v. Ohio, 426 U.S. 610 (1976)). Such improper use occurs when a prosecutor "call[s] attention" to the defendant's silence. Id.

On the other hand, "[w]hile a single comment alone may sometimes constitute a Doyle violation, the Supreme Court[] . . . [made] clear that a single mention does not automatically suffice . . . when the government does not specifically and expressly attempt to use . . . the improper comment to impeach the defendant." United States v. Stubbs, 944 F.2d 828, 835 (11th Cir. 1991) (citing Greer v. Miller, 483 U.S. 756 (1987)). Thus, we have held that if the prosecution mentions the defendant's silence only in passing, and makes no specific inquiry or argument about the defendant's post-arrest silence, there is no due process violation. United States v. Cayasso, No. 04-14867, 2005 WL 1038772 at **3 (11th Cir. May 4, 2005).

Here, while the Government's question was unnecessary and inappropriate,

53

because it suggested that Pless had refused to answer any questions about the murders because of his involvement in them, the reference was too brief to constitute a Fifth Amendment violation under Cayasso and Stubbs. The Government elicited only a single reference to Pless's refusal to respond to questioning, and apparently never referred to the matter again, either in subsequent witness examination or in closing argument. Thus, the denial of a mistrial was not error.

**t) Pless's Exculpatory Post-Arrest Statements**

Pless also challenges the court's denial of his motion to cross-examine Detective Simmons on the exculpatory portions of Pless's post-arrest statements. At trial, the Government objected to the request on hearsay grounds. Although Simmons had been permitted to testify regarding inculpatory portions of the statements, the court sustained the Government's objections. The prosecution now correctly concedes that the denial of Pless's request was error. Federal Rule of Evidence 106 states that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Fed. R. Evid. 106; United States v. Range, 94 F.3d 614, 620-21 (11th Cir. 1996). We have extended Rule 106 to oral

testimony in light of Rule 611(a)'s requirement that the district court exercise "reasonable control" over witness interrogation and the presentation of evidence to make them effective vehicles "for the ascertainment of truth." Range, 94 F.3d at 621 (citing United States v. Castro, 813 F.2d 571, 576 (2d Cir. 1987)). Thus, the exculpatory portion of a defendant's statement should be admitted if it is relevant to an issue in the case and necessary to clarify or explain the portion received. Range, 94 F.3d at 621. In this case, Pless's exculpatory statements were relevant to his involvement in acts implicating him in the Count 2 conspiracy, and were necessary to clarify those portions related by Detective Simmons. The district court therefore abused its discretion in denying Pless's motion.

### 3. Prejudice

All eleven defendants argue that the district court's evidentiary errors were not harmless, considered individually or cumulatively, and entitle them to a new trial. The cumulative error doctrine "provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Munoz, 150 F.3d 401, 418 (5th Cir. 1998); see also Labarbera, 581 F.2d at 110; United States v. Necoechea, 986 F.2d 1273, 1282-83 (9th Cir. 1993) ("In reviewing for cumulative error, the court must review all errors

55

preserved for appeal and all plain errors.").

"The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error--courts look to see whether the defendant's substantial rights were affected." United States v. Rivera, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc) (citing United States v. Kartman, 417 F.2d 893, 894, 898 (9th Cir. 1969)).  However, the cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error. United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993).  The total effect of the errors on the trial will depend, among other things, on "the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy – or lack of efficacy – of any remedial efforts); [] the strength of the government's case," and the length of trial.  Id. at 1196; Hands, 184 F.3d at 1329 ("We determine whether an error had substantial influence on the outcome by weighing the record as a whole, examining the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt.") (internal quotations marks and citations omitted).

Kotteakos v. United States, 328 U.S. 750, 764 (1946), provides that non-constitutional error is harmless

"if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error … . The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

See also United States v. Frazier, 387 F.3d 1244, 1266 n.20 (11th Cir. 2004) (en banc) ("Errors do affect a substantial right of a party if they have a 'substantial influence' on the outcome of a case or leave 'grave doubt' as to whether they affected the outcome of a case."). The same standard is employed to review the prejudicial effects of a district court's plain error, be it of constitutional or non-constitutional dimensions. United States v. Mathenia, 409 F.3d 1289, 1292 (11th Cir. 2005) ("The non-constitutional harmless error standard is not easy for the government to meet. It is as difficult for the government to meet that standard as it is for a defendant to meet the third-prong prejudice standard for plain error review."). Moreover, we note in passing that "[a]n error may substantially influence an outcome and thus warrant reversal even if the evidence, had no error occurred, would have been sufficient to support the conviction." Hands, 184 F.3d at 1329. We also review the record de novo when conducting a harmless error analysis, unlike our review of sufficiency of the evidence challenges, in which we view witness credibility in the light most favorable to the government. Id. at 1330

57

n.23. By contrast, as discussed above, under the plain error standard we may not correct an error unless: (1) there is error; (2) that is plain; and (3) that affects substantial rights. If these three conditions are met, we may exercise our discretion to correct the error, if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings. Cotton, 535 U.S. at 631-32 (2002).

Thus, because the defendants did not preserve any of their constitutional evidentiary claims, we review the aggregate effect of the district court's constitutional and non-constitutional errors under the Kotteakos standard for each defendant.[40] If we find the errors' cumulative effect insufficient to necessitate reversal, we need not consider each individual error's impact as to a defendant.

### a) Williams

The erroneously admitted evidence implicating Williams consisted of: (1) Sergeant Singer's testimony regarding the Gary Coley murder and Williams' subsequent guilty plea to attempted second degree murder; (2) Officer Polite's testimony that Williams had beaten his girlfriend; (3) Detective Capote's testimony about the witness identification of Williams and Casado in the Palmetto Expressway murder; (4) Sergeant Casas' testimony about Williams' involvement in a 1992 shootout at a Miami strip club; (5) testimony that Williams did not have

---

[40] Of course, the defendant still bears the burden of proving the prejudicial effect of all non-preserved errors. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005).

permission to be on the property where he was found following a 1997 car chase; (6) Officer Waltham and Detective Richard's testimony about an armed robbery Williams committed in 1997; (7) Detective Lewis' testimony about Williams' connection to the Amoco double murder and subsequent murder of Corey Murcherson; (8) Lewis' testimony that he was told Richard Stit worked as an "enforcer" for Williams; (9) Detective Borges' testimony about Williams' involvement in the Brownlee murder; and (10) Deputy U.S. Marshal Moran's testimony about Williams' appearance on Crimestoppers and America's Most Wanted.

Two of these items of evidence were independently corroborated by admissible evidence. First, Johnny Hankins corroborated Capote's testimony concerning the Palmetto Expressway murders, recounting a conversation in which Williams confided that he and Casado killed several individuals on an expressway. Second, Lewis's testimony concerning Stit's role as "an enforcer" for Williams was corroborated by Becton, who testified that both he and Stit worked for Williams in Virginia. This independent testimony mitigates the prejudicial effect of the inadmissible Lewis and Capote testimony. Cf. United States v. DeLoach, 654 F.2d 763, 771 (D.C. Cir. 1980) (holding that admission of hearsay testimony was harmless where the jury heard admissible testimony from three other sources

59

to the same effect).

Moreover, the cumulative effect of the district court's errors was harmless given the avalanche of admissible, inculpatory evidence admitted against Williams at trial with respect to every count for which he was indicted. Specifically, nineteen witnesses[41] testified that they personally witnessed or participated in Williams' drug sales operation. Becton also testified that he, Stit, and others transported drugs to Georgia for Williams. Likewise, Hankins said that Marvin Rogers and Gary Dukes transported drugs to Georgia on Williams' behalf. McCrea further told the jury that Williams had "lieutenants" deliver drugs for him, while both Byrd and Royal testified that Byrd transported drugs for Williams. In addition to conceding his own involvement, Hankins also testified that Murcherson, Wilson, and an individual named "Donkey Kong" also worked for Williams.

Voluminous evidence also implicated Williams in violence committed in furtherance of the conspiracy, including: (1) testimony from both Becton and Hankins concerning Williams' involvement in the Rolex shootout; (2) testimony from Becton concerning Williams' role in the "Ankey" murder; and (3) Johnny

---

[41]Michelle Feliciano, Pedro Feliciano, Arial Barrias, Kevin Becton, Nora Byrd, Charles Royal, Johnny Hankins, Herbert McCrea, Steve McGriff, Wimon Nero, Jesus Wilson, Errol Sawyer, Robert Raye, Darren Cochran, Prancina Macintosh, Nelson Darby, Zachary Butler, Reggie White and Sam Jones.

Hampton's testimony that he personally witnessed Williams' involvement in the Harris / Betterson murders. Texidor and Wilson also testified that Williams and Casado planned to murder Robert Sawyer. Police Officers Saud, Rodriguez, and Walthen explained that they arrested Williams (along with Casado) after firearms were thrown from the car in which they were travelling. Finally, numerous witnesses testified that Williams regularly carried firearms.

In this light, even given the district court's numerous evidentiary mistakes, we can still say with "fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Kotteakos, 328 U.S. at 765. The district court's evidentiary errors are thus harmless as to Williams.

**b) Casado**

The district court erroneously admitted evidence of Casado's participation in: (1) the Palmetto Expressway murders; (2) the Jetier murder; (3) the Colors triple murder; (4) the Everett Cooper murder; (5) and the Amoco murders. The lower court also incorrectly allowed the jury to hear evidence that Casado did not have permission to be on the property where he was found following a 1997 car chase, and erred by failing to give a limiting instruction about the threats that Williams, Shaw, Leonard Brown, and Baptiste made to Errol Sawyer.

61

The prejudice resulting from these errors is tempered by the fact that independent admissible testimony corroborated two of the improper pieces of evidence. First, as discussed above, the testimony linking Capote to the Palmetto Expressway murders was corroborated by Johnny Hankins. Second, the inadmissible testimony concerning Casado's involvement in the Jetier shooting was confirmed by Officer Sanchez's testimony that he himself witnessed the shooting and that Casado had been the shooter.

Though the remaining evidentiary errors remain troubling, there was such a mountain of admissible evidence implicating Casado in all of the offenses for which he was convicted that we can fairly say that the evidentiary errors did not affect his substantial rights. Indeed, six witnesses[42] testified that Casado and Williams collaborated in selling cocaine. Hankins specifically testified that whenever Williams and Harper had no cocaine to sell, he bought from Casado. Similarly, McCrea testified that Williams said he was "taking over everything" regarding drug sales while Casado served a prison sentence. Numerous witnesses also testified that Baptiste worked selling drugs for Casado. Sanchez-Carillo testified that he sold cocaine to Casado; Texidor said that the Cruz brothers sold cocaine to Casado; and Sam Jones added that Casado distributed drugs to

---

[42]Becton, Hankins, Raye, Pagan, McGriff, and Wilson.

Pensacola.

The government's evidence also linked Casado to the violent activities committed in furtherance of the charged conspiracy. Brian Wilson testified that Casado was present at the Colors Murders, while McCullough told the jury that according to Hawthorne, Hawthorne and Casado were involved in the Amoco murders. Officer Sanchez stated that he observed that Jetier was shot by individuals in a car in which Casado was travelling with Baptiste. Similarly, Texidor stated that Casado said he (Casado) had shot Jetier. As discussed above, Texidor and Wilson both explained that Casado and Williams planned to murder Robert Sawyer. Wilson further testified that he had been robbed of drugs by assailants traveling in Casado's car. Hankins told the jury that Williams said Casado had been involved in the Harris / Betterson murders. As noted above, Officers Sanchez, Rodriguez, Saud, and Walthen also testified that they arrested Casado after firearms and other items were thrown from the car in which they were traveling. Finally, numerous witnesses testified that Casado regularly carried firearms.

In light of this overwhelming admissible evidence, the prejudice resulting from the district court's evidentiary errors proves insufficient to necessitate reversal of Casado's conviction.

## c) Harper

The district court erred by admitting evidence of Harper's involvement in the Brownlee murder, and by failing to give a limiting instruction about the threats that Williams, Shaw, Leonard Brown, and Baptiste made to Errol Sawyer. However, this evidence proves harmless in light of the large volume of admissible evidence the prosecution amassed against Harper. That evidence included: (1) Hankins' testimony that Harper sold cocaine at the Matchbox with Williams; (2) Becton's testimony that Harper supplied Williams with cocaine; and (3) testimony from Texidor and Hall that Harper bought cocaine from Casado. Hall and Nero also told the jury that they bought cocaine from Harper, while Kerry Smith stated that Harper sold crack in Atlanta and West Palm Beach. Pagan also testified that he sold cocaine to Harper. Rose's testimony that she overheard Nero and Harper discussing drug deals bolstered this evidence.

Admissible evidence also linked Harper to some of the violent incidents committed in furtherance of the conspiracy. Hankins told the jury that Harper was present when Williams fought with a member of the rival Thomas gang, while Becton said that Harper was present at the Rolex when Williams fought with other members of the Thomas gang. Hall further testified that Harper often carried firearms.

In sum, when viewed against the quantum of admissible evidence concerning Harper's participation in all of the offenses for which he was charged, we can fairly say that the evidentiary errors remain harmless.

### d) Leonard Brown

The only evidentiary error affecting Leonard Brown's convictions was the admission of Detective Lewis' testimony about his involvement in the Amoco double murder. As an initial matter, this evidence relates only to Counts 2 and 16 of the indictment, as it bears no discernable relationship to the importation conspiracy count (Count 3). Moreover, the government's case against Brown concerning Counts 2 and 16 was highly compelling. Wilson, Errol Sawyer, and Reggie White all testified that the Brown twins worked for Williams in selling drugs. White also testified that he observed Williams deliver drugs to the twins at Gibson's house, while Sawyer testified that he picked up drugs from the twins at Gibson's house. Wilson explained that the Brown twins worked for Gibson in selling, preparing, and obtaining drugs. Finally, White, McCullough, and McCrea all stated that they bought drugs from the Brown twins.

As for testimony relating to violence, Wilson testified that just prior to the Amoco murders, he purchased ski masks for Brown and saw him with weapons. Johnny Hampton also told the jury that he saw Brown commit one of the Harris /

Betterson murders. Testimony from several witnesses also indicated that Brown often carried firearms.

In light of this considerable amount of admissible evidence adduced in support of Brown's conviction, we cannot say that the district court's error affected his substantial rights.

### e) Malcolm Shaw

As none of the erroneously admitted evidence implicated Malcolm Shaw, there is no question that the evidentiary errors did not affect his substantial rights.

### f) Baker

The district court committed two errors that affected Baker: (1) it admitted Detective Gross' hearsay statements that detailed his participation in a 1997 drug rip-off staged by MDPD Internal Affairs; and (2) it failed to give a limiting instruction about the threats that Williams, Shaw, Leonard Brown, and Baptiste made to Errol Sawyer. However, these errors prove harmless when weighed against the admissible evidence supporting Baker's conviction. Specifically, Raye and Macintosh both testified that Williams arranged for Baker to perform heists of drug money, while McCrea and Kenneth Lurry testified that Shaw made similar arrangements with Baker. Wilson also testified that he had been subject to one of Baker's "rip-offs"; Raye's testimony revealed that Baker's Wilson "rip-off" had

66

been arranged by Williams. McCrea and Wilson also said that they had seen Baker with Shaw, Williams, and others in the group on a number of occasions. In light of this evidence, we are persuaded that the district court's errors were harmless as to Baker.

### g) Baptiste

The district court erroneously admitted evidence of Baptiste's involvement in the Jetier murder and the Colors triple murder. However, these errors, too, were harmless given the abundant amounts of admissible trial evidence incriminating Baptiste. Specifically, Texidor testified that Casado supplied cocaine to customers that Baptiste had lined up. Pagan and Hall also admitted having bought drugs from Baptiste, who acted on Casado's behalf when Casado was unavailable. Conversely, Sanchez-Carillo testified that he sold drugs to Baptiste when Casado was incarcerated. Additional witnesses indicated that Baptiste worked for Casado in counting money, delivering drugs, and acting as a watch-man. According to testimony from Becton and Williams, Baptiste also interacted frequently and closely with the other conspirators.

There was also evidence of Baptiste's involvement in the violent incidents described at trial. As discussed above, Officer Sanchez testified that he observed that Jetier was shot by individuals riding in a car occupied by Baptiste and Casado.

Texidor corroborated that testimony. Brian Gibson also stated that Baptiste was present at the Colors murders.

This admissible testimony against Baptiste thus outweighs any prejudice resulting from the district court's evidentiary errors.

### h) Pless

The district court committed four evidentiary errors that affected Pless: (1) admitting Detective Simmons' testimony concerning Cedrick Brantley's statement that Pless recruited him to murder Johnny Belliard; (2) admitting Detective Mallot's testimony implicating Pless in the Everett Cooper murder; (3) failing to give a limiting instruction about the threats that Williams, Shaw, Leonard Brown, and Baptiste made to Errol Sawyer; and (4) refusing to allow admission of Pless's exculpatory post-arrest statements.

However, two pieces of this erroneously-admitted evidence were independently corroborated by admissible evidence. Specifically, Detective Simmons' testimony regarding Cedrick Brantley's statement was corroborated by testimony from both Pagan and Brantley himself. Likewise, Detective Mallot's testimony linking Pless to the Cooper murder was corroborated by Pagan and by Simmons' testimony regarding Anthony Brantley's statements.[43]

---

[43]As discussed above, Simmons' testimony regarding Anthony Brantley's statements was invited by Pless.

68

Moreover, the record contains a considerable volume of admissible incriminating evidence relating to Pless. Specifically, Detective Simmons testified that Pless told him he bought drugs from Pagan and sold drugs both in Miami and Jacksonville. Pagan too testified extensively concerning Pless's involvement in the charged conduct, explaining that: (1) Pless and Johnson were close and sold crack together at Silver Blue Lakes; (2) Pagan and Casado sold cocaine to Pless; (3) Pless sold drugs in Georgia and Jacksonville; (4) Pless had traveled with Anthony Brantley and Pagan to investigate a distributor's loss of Pless's drugs; and (5) Pless told Pagan that he had murdered Everett Cooper, a Boobie Boys' rival. In addition, Cedrick Brantley testified that Pless paid him to kill Johnny Belliard and that Pless often carried firearms. Becton also explained to the jury that Pless was close to Baptiste and Casado. Similarly, the government introduced evidence of Pless's rap CD, which contained references to Casado, Pagan, Anthony Brantley, Johnson and Baptiste.

Furthermore, DEA analyst Jeanette Davis described wire transfers that Pless had made from Georgia (where some of the group's distribution took place) to Casado, Baptiste, Johnson, and Anthony Brantley in Miami. Finally, Officer Quintero testified that he stopped Pless on October 12, 1993 and found four grams

69

of crack cocaine and $575 in small bills on Pless's person.[44]

In determining harmlessness, we must consider the incentive that Pagan and other government witnesses had to provide testimony that would secure reduced sentences or other favorable treatment. See Hands, 184 F.3d at 1329. However, this does not affect the highly incriminating testimony provided by Agent Davis or Officer Quintero, nor does it impact the particularly damning testimony from Detective Simmons concerning Pless's own statements against his penal interest. In light of this testimony, and considering the record as a whole, we are persuaded that the district court's evidentiary errors were harmless as to Pless.

**i) Johnson**

The erroneously admitted evidence implicating Johnson consisted of Detective Simmons' testimony that Anthony Brantley told him that Johnson was one of the shooters in the Colors murders. As Johnson did not object to admission of that evidence at trial, he must prove that the error affected his substantial rights and that if uncorrected the error would seriously affect the integrity or reputation of judicial proceedings. Cotton, 535 U.S. at 631-32. He can do so because the

---

[44]Some testimony adduced at trial indicated that Pless and Johnson were involved in the murder of Roosevelt Davis. While the government argues that this murder was committed in retaliation for Davis's theft of money and drugs from Pless's home, some testimony indicated that the murder was carried out to avenge Davis's assault of Pless's wife. Even if we accept the government's claim that Pless was responding to the theft, there is no evidence linking the theft or the items stolen to the Boobie Boys' operations. As such, we cannot weigh evidence of the Davis murder in favor of Pless's conviction on the drug conspiracy count.

70

testimony regarding the Colors murders was the primary evidence linking Johnson

to both the firearms conspiracy and the drug conspiracy. The remaining admissible

testimony concerning Johnson's involvement is limited to: (1) Pagan's testimony

that Pless and Johnson were close and that they sold crack together; and (2) Emery

Moon's and Credrick Brantley's testimony that Johnson regularly carried firearms.

This testimony fails to establish a link between Johnson and any conspirator other

than Pless. In any event, the government's relatively thin evidence of Johnson's

participation was clearly outweighed by the very prejudicial effect of hearsay

evidence implicating Johnson in the murders of two adults and a young child at the

Colors apartments. This error thus requires that Johnson's convictions on Counts 2

and 16 be reversed.

## j) Gibson

The district court made two evidentiary errors that affected Gibson: (1)

Jeffrey Gibson's testimony concerning Gibson's 1974 manslaughter conviction[45];

---

[45]On cross-examination, the government asked Jeffrey Gibson about his knowledge of Gibson's past convictions. Jeffrey Gibson responded that Gibson had told him about her manslaughter conviction. The defense objected and moved for a mistrial. The district court then gave the jury a curative instruction in which it directed them to disregard the reference to the prior conviction. On appeal, the government properly concedes that the admission was error, as the conviction dates from 1974. See Fed. R. Evid. 609(b). However, we must nonetheless determine whether the impermissible reference to Gibson's prior conviction was harmless in light of the district court's curative instruction and the other admissible evidence adduced in support of Gibson's conviction. See United States v. LeQuire, 943 F.2d 1554, 1571-72 (11th Cir. 1991) (holding harmless an inadmissible comment, as prejudicial effect was removed by district court's curative instruction).

and (2) the failure to give a limiting instruction about the threats that Williams, Shaw, Leonard Brown, and Baptiste made to Errol Sawyer.

The record indicates that these errors prove insufficiently prejudicial to warrant reversal of Gibson's conviction. The government's case against Gibson included testimony from McCullough, Hankins, and Kenneth Johnson that Gibson sold cocaine. Johnson also admitted that he sold cocaine for Gibson on a number of occasions. Errol Sawyer stated that Gibson's sons (the Brown twins) sold drugs for her, and McCullough stated that the twins prepared crack in Gibson's home while she was present. As discussed above, witnesses also testified as to drug deliveries made to and from Gibson's home. Kenneth Johnson, Errol Sawyer, and Reggie White also testified to Gibson's involvement in drug sales in the 1980s. White added that he had seen firearms in plain view at Gibson's house while Gibson was present, while Hankins and Theodie Brown said that Gibson often carried firearms. The jury was also made aware that Gibson is Williams' aunt.

While Gibson argues that the erroneous admission of her prior conviction prevented her from convincing the jury that she was uninvolved in the violent acts committed by her co-defendants, the government produced admissible testimony which itself significantly undermined any attempt by Gibson to present a non-violent image to the jury. Specifically, as noted above, two witnesses testified that

72

Gibson often carried firearms; a third indicated that he saw assault rifles in plain view in Gibson's home while Gibson was present. This more recent evidence did at least as much damage to Gibson's effort to present a non-violent image to the jury as did the erroneous admission of her 1974 manslaughter conviction. Moreover, the fact that the jury acquitted Gibson on the charges in Count 17 suggests that the evidentiary error did not so prejudice the jury as to prevent it from independently weighing the evidence as to each charge against her. In this light, we find the district court's evidentiary errors harmless as to Gibson.

### k) Hawthorne

The erroneously admitted evidence against Hawthorne was Detective Lewis' highly inflammatory and wholly inadmissible testimony about Hawthorne's participation in the Amoco double murders. Although this testimony was corroborated by Roger McCullough, Hawthorne's half-brother, it was called into question by testimony from Karen Mills-Francis that Corey "Fish Grease" Murcherson, and not Hawthorne, had admitted to being the second gunman. This alternate theory was supported by evidence that Murcherson looked very similar to Hawthorne, and had been subsequently murdered for his involvement in the shooting. The Lewis testimony was vital, however, because he was the only one able to relate the Amoco shooting to the overall purposes of the conspiracy,

thereby making its admissibility all the more unfairly prejudicial.

That aside, admissible testimony establishing Hawthorne's participation as a conspirator in the specific drug and firearm conspiracies charged is very weak. Sawyer and White both testified that Hawthorne had acted as a customer, watch-man, and sales agent for Sawyer. Becton stated that he saw Hawthorne purchase what appeared to be drugs from Casado and Baptiste. Trial testimony established that Hawthorne fraternized with the Brown twins and other associates of Williams. Officer Robin Starks testified that Hawthorne had been arrested for cocaine possession and that she once witnessed Hawthorne give a cocaine-like substance to another individual. Officer David Williams said that he once observed firearms tossed from a car in which Hawthorne was traveling.[46]

The record is notably devoid of evidence directly indicating that Hawthorne used firearms in relation to the charged drug crimes. Furthermore, much of the testimony linking Hawthorne to his alleged co-conspirators was elicited from incarcerated witnesses who may have had a motive to provide incriminating testimony in return for a possible sentence reduction.[47] The remaining admissible

---

[46] While the government's initial brief claims that Hawthorne was the "Moose" who robbed Jesus Wilson of 40 kilograms of cocaine at the Port of Miami in early 1998, uncontroverted trial testimony established that Hawthorne was not.

[47] "When we assess the strength of the government's case for purposes of harmless error analysis …we may take into account factors – such as incentives to lie – that would have affected the jury's assessment of a witness's testimony." Hands, 184 F.3d at 1331.

evidence indicating that Hawthorne associated with several of the conspirators and had been implicated in isolated drug deals proves insufficient to render the extremely prejudicial inadmissible evidence of participation in the Amoco murders harmless. Particularly in light of credible evidence that Murcherson (and not Hawthorne) was the second shooter in the Amoco murders, the highly prejudicial nature of Lewis' inadmissible testimony suggesting that Hawthorne was the shooter casts grave doubt on Hawthorne's convictions for Counts 2 and 16, which must be reversed.

## B. Sufficiency of the Evidence

Six defendants (Baker, Baptiste, Pless, Williams, Casado, and Hawthorne) argue that the evidence at trial was insufficient to support their convictions.[48] We review the sufficiency of evidence supporting a conviction de novo to determine whether there was substantial evidence, viewed in the light most favorable to the government, to support the jury's guilty verdict. Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Toler, 144 F.3d 1423, 1426-27 (11th Cir. 1998); United States v. Malatesta, 590 F.2d 1379, 1382 (5th Cir. 1979) (en banc).[49] The

---

[48] We decline to reach Hawthorne's sufficiency of the evidence claims as he is entitled to a new trial on other grounds.

[49] This Circuit has at times applied a more lenient "slight evidence" standard of review for sufficiency of the evidence challenges, such as in United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997) ("[O]nce the government establishes the existence of the underlying conspiracy, [] it only needs to come forward with slight evidence to connect a particular

evidence at trial is sufficient to support a guilty verdict so long as a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt. Toler, 144 F.3d at 1428. In other words, a guilty verdict will not be disturbed on appeal unless no reasonable trier of fact could have found guilt beyond a reasonable doubt on the evidence before it. Id.

## 1. Baker

Baker's challenge to the sufficiency of the evidence supporting his conviction for the Count 2 conspiracy is meritless in light of the overwhelming evidence of his guilt produced at trial. To support a conspiracy conviction under 21 U.S.C. § 846, the government must prove, beyond a reasonable doubt: (1) an agreement between the defendant and one or more persons, (2) the object of which is an offense under Title 21 of the United States Code. See Toler, 144 F.3d at 1426 (11th Cir. 1998); United States v. Parrado, 911 F.2d 1567, 1570 (11th Cir. 1990) ("To support a conspiracy conviction under 21 U.S.C. § 846, the government must prove that there is an agreement by two or more persons to violate the [federal]

---

defendant to the conspiracy." (quoting United States v. Harris, 20 F.3d 445, 452 (11th Cir. 1994)). Such a standard is inconsistent with Glasser's and Malatesta's requirement that the government provide "substantial evidence" of a defendant's guilt at trial. Malatesta, 590 F.2d at 1381-82 ("The 'slight evidence' rule as used and applied on appeal in conspiracy cases since 1969 should not have been allowed to worm its way into the jurisprudence of the Fifth Circuit. It is accordingly banished as to all appeals hereafter to be decided by this Court." (citing Glasser, 315 U.S. at 80)); see also United States v. Clavis, 977 F.2d 538, 539 (11th Cir. 1992) (withdrawing opinion decided using "slight evidence" standard).

narcotics laws.").[50]   When a charged conspiracy centers around a central organizer

or organizers (a so-called "hub-and-spoke" conspiracy), the Government must

establish that a given defendant was party to that central conspiracy, rather than to

a separate and uncharged conspiracy with one of the organizers.  See, e.g.,

Kotteakos, 328 U.S. at 755 (1946).  However, the defendant need not participate in

all the activities forming the larger conspiracy, so long as he is aware of the general

scope and purpose of the conspiratorial agreement.  Toler, 144 F.3d at 1427-28

("[N]otwithstanding that there may be a large number of co-conspirators, a

defendant's guilt can be established if his or her contact extends to only a few or

even one of the co-conspirators so long as the agreement, with its concomitant

knowledge of the general scope and purpose of the conspiracy and the defendant's

intent to participate in achieving its illegal ends, is proven beyond a reasonable

doubt.").  Thus,

---

[50] We note that some of our caselaw has analyzed sufficiency of the evidence challenges to conspiracy convictions under 21 U.S.C. § 846 using a three-prong "shorthand" test that asks whether the government has adequately proven: "(1) an agreement existed among two or more persons; (2) that the defendant knew of the general purpose of the agreement; and (3) that the defendant knowingly and voluntarily participated in the agreement."  United States v. High, 117 F.3d 464, 468 (11th Cir.1997).  This shorthand, we have noted, is "somewhat redundant and incomplete" – redundant because the existence of an agreement necessarily implies that the defendant knew of the agreement's objective and voluntarily assented (i.e. "agreed") to participate in it, and incomplete because it does not mention that the object of the agreement must be illegal, in this case a violation of an offense under Title 21 of the United States Code.  Toler, 144 F.3d at 1425-26 & n.3.  Thus, we opt for the more accurate two-prong test elaborated in Toler and Parrado.

"[i]t is often possible, especially with drug conspiracies, to divide a single conspiracy into sub-agreements. This does not, however, mean that more than one conspiracy exists. The key is to determine whether the different sub-groups are acting in furtherance of one overarching plan.

Calderon, 127 F.3d at 1329 (internal quotation marks omitted).

In this case, there is ample evidence for the jury to have found that Baker agreed with his other co-defendants to possess with intent to distribute and to distribute cocaine and cocaine base. The government's case included evidence that Williams, Harper, and Shaw paid Baker, then an MDPD officer, thousands of dollars to steal drugs and money from their customers by pulling them over in his squad car and searching their vehicles. The evidence also showed that such "rip-offs" were intended to recover money spent on drugs and thus increase the conspirators' revenue. Moreover, although Baker's involvement with the conspiracy was limited to these "rip-offs," testimony from government witnesses established that Baker was well-acquainted with Williams, Shaw, and Harper. A reasonable jury could therefore have inferred that Baker knew of the scope and object of the larger Count 2 conspiracy, and joined that conspiracy, even though his participation in that scheme was limited. See Toler, 144 F.3d at 1428-30.

## 2. Baptiste

Baptiste also contends that the evidence at trial was insufficient to support his conviction for the Count 2 conspiracy. The volume of incriminatory evidence

78

at trial belies his argument. As discussed above, multiple witnesses testified to Baptiste's involvement in sales of large volumes of narcotics, his close business relationship and friendship with Casado, and his frequent association with Williams and Harper. Viewing this evidence in the light most favorable to the government, it would be impossible to conclude that Baptiste did not agree to violate federal drug laws with at least one other co-conspirator, and that he did not know of the scope and object of the larger conspiracy.

### 3. Pless

Pless argues that the evidence was insufficient to convict him of Count 15 of the indictment, which charged distribution of fifty grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1). A conviction under § 841 requires the government to prove that the defendant possessed a controlled substance knowingly and willfully and that he did so with the intent to distribute it. United States v. Anderson, 289 F.3d 1321, 1325 (11th Cir. 2002). Pless argues that such evidence was lacking, as the evidence showed that: (1) the substance was cocaine base (rather than powder cocaine); and (2) the substance weighed less than fifty grams. Pless also asserts that the government failed to establish that he was involved in distributing cocaine.

Pless's first two arguments are foreclosed by Circuit precedent, which makes

79

clear that because the specific amount and type of drugs are not elements of the offense, the government's failure to prove the amount or type charged in the indictment does not merit reversal. See United States v. Rutherford, 175 F.3d 899, 906 (11th Cir. 1999); United States v. Adams, 1 F.3d 1566, 1582-83 (11th Cir. 1993). Moreover, the record contains sufficient evidence from which the jury could reasonably conclude that Pless engaged in cocaine distribution. Specifically: (1) Pagan testified that Pless supplied drugs to a customer in Jacksonville; (2) Detective Simmons testified that Anthony Brantley told him that he (Brantley) continued to sell drugs for Pless after the Colors murders; and (3) Simmons told the jury that Brantley had been arrested in 1997 in possession of cocaine that he obtained from Pless.[51] When this evidence is viewed in the government's favor, it provides sufficient evidence of Pless's involvement in distribution to support Pless's conviction on Count 15.

**4. Williams**

Williams argues that the evidence was insufficient to convict him on the CCE charge alleging violations of 21 U.S.C. §§ 848(a) and (b)(2)(A) in Count 1 of the indictment. To support a jury verdict under 21 U.S.C. §§ 848(a) and

---

[51] Pless argues that the government is not entitled to rely on Detective Simmons' testimony concerning statements made by Anthony Brantley because such testimony is inadmissible hearsay. However, as discussed above, Pless's counsel invited this error during cross-examination of Simmons.

(b)(2)(A)[52] the Government must show:

> (1) a felony violation of the federal narcotics laws involving at least 300 times the quantity of a substance described in 21 U.S.C. § 841(b)(1)(B);
> (2) as part of a continuing series of violations;
> (3) in concert with five or more persons;
> (4) for whom the defendant is the <u>principal</u> administrator, organizer, or leader of the enterprise or is one of several such <u>principal</u> administrators, organizers, or leaders; and
> (5) from which he derives substantial income or resources.

In finding Williams guilty on the CCE count, the jury returned a special

---

[52] The CCE statute imposes a mandatory minimum prison term of at least 20 years upon a person who engages in a "continuing criminal enterprise." 21 U.S.C. § 848(a) (2005). It imposes a life sentence on "[a]ny person who engages in a continuing criminal enterprise" if

> (1) such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and
> (2) (A) the violation referred to in subsection (c)(1) of this section involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title.

<u>Id.</u> § 848(b).

Subsection (c) of that same statute provides:

> [A] person is engaged in a continuing criminal enterprise if--
> (1) he violates any provision of [the federal drug laws, i.e.,] this subchapter or subchapter II of this chapter the punishment for which is a felony, and
> (2) such violation is a part of a continuing series of violations of [the federal drug laws, i.e.,] this subchapter or subchapter II of this chapter--
> (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer [or supervisor or manager] and
> (B) from which such person obtains substantial income or resources.

<u>Id.</u> § 848(c).

verdict finding that the three separate "violations" constituting Williams' "continuing series" included (1) "drug trafficking to Georgia"; (2) "Matchbox apartments drug sale"; and (3) "Port of Miami incident." Williams claims that the evidence did not demonstrate that he supervised, organized or managed anyone who sold drugs at the Matchbox complex. This argument clearly fails. Testimony from multiple witnesses demonstrated Williams' supervisory role in the Matchbox sales. One witness, Kevin Becton, even testified that Williams drew up a blueprint for the operation of a drug trafficking organization while in prison. Thus, we find the evidence sufficient to support Williams' conviction on Count I.

## 5. Casado

Casado also challenges his CCE conviction on the basis that there was insufficient evidence that he supervised, organized or managed drug sales at the Matchbox complex, one of the three predicate acts the jury found on its special verdict form. There is, in fact, no evidence indicating that Casado was an immediate "principal administrator, organizer, or leader" of any drug sales at the Matchbox complex — but there is plentiful evidence that Williams was. Moreover, at that time Casado and Williams were clearly joint "principal administrators, organizers, or leaders" of a larger continuing criminal enterprise of which the Matchbox sales were a reasonably foreseeable part. That is enough to

82

attribute responsibility for being a principal organizer of the Matchbox drug sales to Casado for the purposes of the CCE statute. Co-conspirators are liable for the reasonably foreseeable acts of another co-conspirator taken in the course of and in furtherance of the unlawful agreement, regardless of whether they had actual knowledge of those acts, so long as they played more than a minor role in the conspiracy or had actual knowledge of at least some of the circumstances and events culminating in the reasonably foreseeable event. See, e.g., United States v. Gallo, 195 F.3d 1278, 1282 (11th Cir. 1999) (sentencing context); United States v. Broadwell, 870 F.2d 594, 603-04 (11th Cir. 1989); United States v. Alvarez-Valenzuela, 231 F.3d 1198, 1203 (9th Cir. 2000). Because a continuing criminal enterprise requires the leader(s) to act "in concert" with others, it is a type of conspiracy. Therefore, we have held that a leader of a continuing criminal enterprise is liable for the reasonably foreseeable acts of those he administrates, organizes, or leads. United States v. Michel, 588 F.2d 986, 999 (5th Cir. 1979) ("[The Pinkerton vicarious-liability rationale] should be no less strictly applied to hold the organizer or supervisor of a criminal enterprise responsible for the acts of his co-conspirators done in furtherance of the operation he manages. … [W]e hold Pinkerton and its progeny equally applicable to defendants charged with either conspiracy to violate the drug laws or a section 848 continuing criminal

83

enterprise."). Similarly, if one leader of a CCE acts jointly with another leader, as contemplated by 21 U.S.C. § 848(b)(1), each is vicariously responsible for all reasonably foreseeable acts committed in furtherance of the CCE by the other. By 1993-94, Williams and Casado were jointly orchestrating a drug operation of sufficient scope that Williams' organization of Matchbox sales at that time can reasonably be considered in furtherance of the CCE, and are thus attributable to Casado.

## C. Severance

Nine defendants (Baker, Baptiste, Leonard Brown, Hawthorne, Gibson, Harper, Casado, Johnson, and Shaw)[53] challenge the district court's denial of their motions to sever their trials from those of their co-defendants. According to these defendants, the introduction of evidence concerning the various murders and other gang violence, in which these defendants claim they were not involved, had a "spillover effect" that prejudiced the jury against all of the defendants – not merely those responsible for the violence.

Federal Rule of Criminal Procedure 8(b) provides that

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts

---

[53] We note that we have reversed the convictions of Johnson and Hawthorne on other grounds.

together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).

Rule 14(a) provides that

If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a).

In practice, the general rule is that defendants who are jointly indicted should be tried together, particularly in conspiracy cases. United States v. Pedrick, 181 F.3d 1264, 1272 (11th Cir. 1999); United States v. Alvarez, 755 F.2d 830, 857 (11th Cir. 1985). Severance may be granted at the discretion of the district court if the court determines that prejudice will result from the joinder. Id. A district court's denial of a motion for severance is reversible only for abuse of discretion, and we have explicitly noted that appellate courts are generally reluctant to second guess a district court's decision on severance. Id.

In deciding a severance motion, a district court must balance the right of the defendant to a fair trial against the public's interest in efficient and economic administration of justice. Alvarez, 755 F.2d at 857. Severance is granted only when the defendant can demonstrate that a joint trial will result in "specific and

compelling prejudice" to the conduct of his or her defense, id., resulting in "fundamental unfairness." United States v. Knowles, 66 F.3d 1146, 1159 (11th Cir. 1995). It is not enough for a defendant appealing a denial of severance to show that acquittal would have been more likely had the defendant been tried separately, since some degree of bias is inherent in any joint trial. Alvarez, 755 F.2d at 857. Moreover, a defendant does not suffer "compelling prejudice simply because much of the evidence at trial is applicable only to his codefendants," id., even when the disparity is "enormous." United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997).

In order to mitigate any "spillover effect" on co-defendants, a court should ordinarily give cautionary instructions to the jury, advising that certain evidence is to be considered relevant only as to certain defendants or certain charges. Severance is justified as a remedy only if the prejudice flowing from a joint trial is clearly beyond the curative powers of such instructions. Alvarez, 755 F.2d at 857. An appellate court reviewing the denial of severance must decide whether the jury could follow the district court's cautionary instructions and determine the guilt or innocence of each defendant solely on the basis of that defendant's conduct (i.e. without cumulating the guilt of all the defendants and imputing it to each of them). Id. at 858.

In evaluating a jury's ability to sift through the evidence presented and to make individualized interpretations of guilt, an appellate court may consider whether the jury issued a "split" verdict, finding guilt as to some defendants or charges but not as to others. Split verdicts weigh against a finding of undue "spillover." United States v. Cassano, 132 F.3d 646, 651-52 (11th Cir. 1998) Schlei, 122 F.3d at 984; United States v. Jacoby, 955 F.2d 1527, 1542 (11th Cir. 1992).

As detailed above, the trial in this case included a great deal of testimony and other evidence related to the violent actions of various conspirators in connection with the drug distribution operation. Witnesses testified to at least 23 separate shootings perpetrated by members of Williams' organization, most of them resulting in deaths. Approximately 10 of those incidents stemmed from a conflict between Williams' group and the Thomas gang. Other testimony described several of the witnesses as "always armed" or as possessing firearms in their residences. Photos of the body of one of the victims (Bennie Brownlee) and a video of one of the co-conspirators (Lenard Brown) "shooting people" were shown to the jury. Furthermore, weapons, ammunition, and other equipment used in the co-conspirators' violent activities was displayed before the jury, along with a particularly vivid demonstration of an ammunition clip being inserted into a gun.

87

Finally, Errol Sawyer testified that Baptiste, Brown, Shaw and Williams threatened violence against Sawyer in the holding area during the trial.

The alleged "spillover effect" of the evidence of violence is insufficient to justify reversal of the district court's severance motion. First, contrary to the assertions of several of the Defendants, most of the witness testimony concerned the distribution of drugs rather than shootings or possession of weapons. The violent activities, moreover, were primarily aimed at the protection of the distribution enterprise and its members from rival organizations. Thus, the evidence of violence was plainly relevant to the charge that the Defendants were involved in a broad conspiracy.

Second, most of the Defendants challenging the denial of severance were implicated to some extent in the violent activities. Shaw was allegedly involved in the threats against the witness Sawyer. Baptiste was involved in the 1991 incident involving the firing of shots from one vehicle to another and the capture of semi-automatic firearms (described at trial by Officer Sanchez), the 1995 incident involving the murder of three people at the Colors Apartments (described by Brian Gibson), and the threats against witness Sawyer. Leonard Brown was allegedly involved in the same threats against Sawyer and a prior effort to kill him, the Corey Murcherson murder, and a 1998 incident in which police recovered firearms

thrown from the vehicle in which he was traveling. Other witness testimony indicated that Brown was frequently armed. Testimony at trial indicated that Casado was involved in the Palmetto expressway murders. Harper was present for several violent incidents, including the shooting of Williams at the Rolex. Hawthorne was involved in the 1998 incident involving the throwing of firearms from a vehicle (noted above). The only defendants not involved in the alleged violence were Gibson, Johnson and Baker. As to Gibson, testimony from two defendants (Roger McCollough and Theodie Brown) indicated that Gibson carried weapons regularly and kept (or was aware of the presence of) other weapons at her house. Likewise, testimony from Emery Moon and Cedrick Brantley indicated that Johnson regularly carried firearms.

In Alvarez, two federal agents were shot – one of them fatally – in the course of a sting operation conducted against a group of drug dealers. In the ensuing trial, several defendants were charged with murder in addition to conspiracy to distribute drugs. The weapons used in the incident were introduced into evidence, as was testimony regarding the shooting, although photos of the agent's body were suppressed. Although two of the co-defendants moved for a separate trial, arguing that they were not accused of involvement in the shooting and would suffer incurable prejudice from a joint trial with the accused murderer, the court elected

89

instead to give a curative instruction prior to the introduction of the evidence concerning the murder, and again at the close of the evidence. We held that the court's instruction was sufficient to mitigate any spillover effect, and affirmed the district court's denial of severance. Alvarez, 755 F.2d at 858. Although the evidence of violence in this case was considerably more extensive than that presented in Alvarez, the defendants in Alvarez were not involved in any alleged violent acts. That the prejudice inflicted upon the Alvarez defendants was insufficiently "compelling" to mandate severance suggests that the Rule 14 challenges of the Defendants – many of whom were implicated in violent activity – must similarly fail.

Third, the judicial economy considerations weighing in favor of a joint trial are significant. This case involved 15 indicted co-conspirators, a 17-count indictment, and a 7-week trial with 94 witnesses and substantial physical evidence. The bulk of the evidence was relevant to demonstrating the existence and scope of the conspiracy itself. In order to completely shield each defendant from the potentially prejudicial effect of evidence of violence in which such defendant was not directly involved, the court would have had to order separate trials for each of the defendants, and many of the witnesses would have had to testify in multiple proceedings. The need to avoid such wasteful expenditure of judicial resources is

the basis for the default rule that co-conspirators should be tried together. See United States v. Pepe, 747 F.2d 632, 651 (11th Cir. 1984) (stating that judicial economy weighed "heavily" against severance in a case involving six defendants, a seven-count indictment, and a five-week trial).

Thus, the potential "spillover effect" of the witness testimony and other evidence concerning the various co-defendants' violent activities did not amount to "compelling prejudice" sufficient to render the district court's denial of severance an abuse of discretion. This is particularly clear as to those defendants who were implicated to some extent in the violence. Baker has a somewhat stronger argument, since it was not alleged that he participated in any of the shootings or possessed any of the recovered weapons. Nevertheless, given the relevance of the evidence to the broader conspiracy charge, the jury's split decision, the need to promote judicial economy, and our decision in Alvarez, Baker's "spillover" claim must fail as well.

Baker asserts another basis for reversing the district court's denial of his severance motion, arguing that the court's refusal to sever his trial prevented Baker from obtaining exculpatory testimony from Malcolm Shaw. According to Baker, Shaw was willing to testify that he never asked Baker to "rip off" drugs or money from other persons, and that while in Shaw's presence, Baker had never observed

any drugs inside the residence of Prancina McIntosh, Baker's ex-girlfriend and Shaw's cousin. Baker produced a sworn affidavit from Malcolm Shaw in support of this claim. In the affidavit, Shaw stated that he intended to exercise his Fifth Amendment right and refrain from testifying in his own trial, but would be willing to testify for Baker in a separate trial. Baker argues that Shaw's testimony would have refuted testimony from McIntosh stating that Shaw had told her that Baker had committed the "rip-offs," and that while inside McIntosh's residence, Baker had observed drugs belonging to Shaw.

A defendant arguing for severance on the ground that it will permit the exculpatory testimony of a co-defendant must show: (1) a bona fide need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the co-defendant would have testified at a separate trial. United States v. Cobb, 185 F.3d 1193, 1197-98 (11th Cir. 1999).

Even if the defendant establishes all four of the above elements, the court, in deciding whether to grant severance, must still: (1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider judicial administration and economy; and (4) give weight to the timeliness of the motion.

Id. Shaw's affidavit is insufficient to require reversal of the district court's denial of severance, for four reasons.

First, the motion was untimely. Federal Rule of Criminal Procedure 12(b)(3)(D) requires that Rule 14 severance motions be made prior to trial. Although we allow some leeway for defendants whose severance motions are based on grounds not known before trial, see United States v. Hewes, 729 F.2d 1302, 1320 (11th Cir. 1984), and Baker reasonably argues that he did not know in advance what testimony McIntosh would give at trial (and thus what Shaw's affidavit might usefully contain), Cobb requires that we weigh untimeliness as a factor. Here, Baker's motion was not filed until February 16, 2000 – nine days after the trial began. Nothing prevented Baker from obtaining from his co-defendants, before the trial, agreements to testify on his behalf in a separate trial, even if the precise content of such testimony could not be conclusively specified.

Second, the Shaw affidavit was conclusory and self-serving. We have held that when an affidavit in support of a severance motion proffers testimony that "consist[s] of bare exculpatory denials, devoid of any specific exonerative facts . . . [and] in no way contrary to [the co-defendant's] own interests," a district court is justified in refusing to grant severance on the basis of the affidavit. United States v. Novaton, 271 F.3d 968, 990 (11th Cir. 2001) (quoting Pepe, 747 F.2d at 651).

93

"Therefore, statements concerning the testimony that would become available by severing trials must be specific and exonerative, rather than conclusory or self-serving, in order to justify severance." Novaton, 271 F.3d at 990. The affidavit submitted in Novaton stated simply that the affiant and the defendant did not engage in the alleged conspiracy; we held that this statement was insufficient to require severance. Id. In Pepe, we affirmed a district court's refusal to sever a trial based on an affidavit in which the affiants promised to testify that the affiants had not been involved in any illegal loan sharking, that the defendant was not associated with any such activity, and that the affiants had never asked the defendant to attend a meeting concerning such activity. Pepe, 747 F.2d at 650. Similarly, in United States v. DeSimone, 660 F.2d 532 (5th Cir. Unit B Nov. 1981), we affirmed a district court's refusal to sever a case based on an affidavit stating that the affiant had not conspired with his co-defendants, and that neither he nor they had possessed marijuana as charged in the indictment. Id. at 540. In all three cases, we noted that the proffered testimony consisted of bare denials, and tended to exculpate the affiant, thus promoting his/her self-interest.

Shaw's affidavit, on which Baker based his renewed severance motion, states Shaw's willingness to testify that Baker did not "commit[] crimes involving drugs and or money rip-offs at [Shaw's] request," nor "observe[] drugs in my

94

presence." These statements, like those in <u>Novaton</u>, <u>Pepe</u>, and <u>DeSimone</u>, are simply general denials of the government's allegations against Baker, and serve Shaw's interest by denying his culpability.

Third, the absence of Shaw's testimony was insufficiently prejudicial. A number of other witnesses testified to Baker's involvement in the conspiracy. Ronald Raye testified that Baker had pulled over a car in which Raye and Jesus Wilson were traveling, and had stolen money (the proceeds of a drug sale) from the trunk. According to Raye, he and Williams had arranged for Baker to stop the car as part of a fake "bust," and to steal the money so that Raye and Williams could collect Wilson's share. Wilson corroborated the account of the fake "bust" (though not of the advance planning), and added that Baker regularly socialized with Williams and that Baker was known as a "dirty cop." Kenneth Lurry testified that Malcolm Shaw had advised him that Baker could help him "rip off" certain drug suppliers by arranging a fake bust and taking the suppliers' money. Herbert McCrea similarly testified regarding two instances in which he, Malcolm Shaw, and Baker planned similar fake busts to "rip off" money from drug suppliers. Even if Shaw's proffered testimony were admitted, it is dubious that it would have been enough to overcome the conflicting and incriminating testimony from these multiple government witnesses.

Fourth, as discussed above, considerations of judicial economy weigh against holding a separate trial for Baker. Thus, we conclude that the district court did not abuse its discretion in denying Baker's motion to sever.

**D. Shackling**

A week prior to trial, the United States Marshal's office for the Southern District of Florida recommended additional security measures for trial. In addition to calling for the presence of many additional security officers in the courtroom and an additional magnetometer (metal detector) directly outside the courtroom doors, the Marshal's office recommended shackling all of the defendants except Baker (a police officer who was out on bond), and Johnson (a paraplegic confined to a wheelchair).

The remaining nine defendants would be bound by leg irons. Each shackled defendant would have his or her own separate set of irons; they would not be shackled to one another. To prevent the jury from discovering that the defendants had been shackled, the Marshal's office recommended placing an opaque bunting or drape around the defense counsel table to prevent the jury from seeing the shackles once the defendants were seated. Moreover, the Marshals actually draped an opaque bunting around government counsel's table and along the railing to make sure the bunting was not focused on any one side of the courtroom. The

defendants would also be brought in and out of the courtroom while the jury was not present, so that they would always be seated behind the bunting while the jurors were in the jury box. Finally, the Marshal's office recommended that the leg irons be padded with styrofoam for the defendants' comfort and to prevent them from making noise when the defendants moved.

The defendants objected to the shackling recommendation, and the district court ordered an evidentiary hearing to determine whether the leg irons were an appropriate measure. Three witnesses called by the government testified at the hearing: (1) James Tassone, the Marshal for the Southern District of Florida; (2) Sergeant Anthony Monheim of the Miami Police Department; and (3) Christina Fernandez, Supervisor of Court Security for the Marshal's Office and Tassone's supervisor. The defendants cross-examined each of them but called no witnesses of their own, although given the opportunity. Tassone testified that his office viewed the case as a "high threat trial," because of the "sheer number" of defendants, their "extensive" criminal history, the existence of unindicted co-conspirators who were still fugitives, and the fact that the indictment charged the defendants with violent crimes and firearms offenses, some involving weapons that had not been recovered. Another factor supporting the shackling of these defendants, Tassone added, was a recent, unrelated multi-defendant trial in which

unshackled defendants caused two violent courtroom disturbances, as well as altercations while being transported to trial and while in holding cells at the federal detention center. The shackling in this case, he stated, was "precautionary."

However, on cross-examination Tassone admitted that he had not determined, on an <u>individual</u> basis, that each of the nine shackled defendants was dangerous enough to require leg irons, which he described as a "minor inconvenience." He did, however, testify that while he did not make individual assessments of each defendant, his staff in the Marshal's Office did, researching the histories of each of the defendants, and also considering the history of the group as a whole. He told the court his office viewed the defendants "on a total basis." Tassone conceded knowing little about the individual defendants himself, including facts that would be highly relevant to his office's shackling recommendation.

For instance, Tassone did not know that both Williams and Casado had already been tried together for other crimes in the Southern District of Florida and had not to anyone's knowledge caused a disturbance, although he "believe[d]" that his staff "would have taken [this information] into consideration." He admitted that he was not personally aware that Leonard Brown had stood trial in state court on first-degree murder charges (that were alleged in the indictment as an overt act

98

in furtherance of the Count 2 conspiracy) approximately one year prior without incident. He did not know that Gibson was a 47-year old woman whose only record of violent criminal activity was a 26-year old manslaughter conviction related to a domestic incident. Nor did Tassone know that his office had recommended that Baker and Johnson not be shackled. In fact, Tassone stated that he "[didn't] know any of the defendants individually" and "probably" didn't even know their names. Nonetheless, Tassone defended his office's "group assessment" of the need to shackle nine of eleven defendants on the basis that "it really wouldn't be practical to not shackle some [defendants] and shackle others" — even though his office had not recommended shackling Baker or Johnson based on their individual characteristics.

Sergeant Monheim, a homicide investigator who had been investigating the defendants since February of 1998, testified about the danger he felt the defendants posed at trial. He stated that the "overall picture" of the defendants was "an organization involved in narcotics trafficking," with numerous attendant acts of violence "including drive-by shootings, shootings of innocent persons and 15 murders that . . . [were] charged in the indictment."[54] He added that most of the

---

[54] The third superseding indictment alleged that six of the shackled defendants had committed at least one homicide in furtherance of the conspiracy: Pless (five), Williams (two), Casado (four), Baptiste (one), Brown (two), and Hawthorne (one).

murders were committed with assault weapons such as AK 47 assault rifles.

Sergeant Monheim added that Baptiste and other unnamed individuals had

threatened prospective witnesses, that Baptiste had been disruptive during a

medical examination, and that he believed that unindicted co-conspirators who had

access to assault weapons were still at large. Specifically, Monheim testified that

many death threats were made to witnesses, including "threats of harm to

families."

Sergeant Monheim then detailed the criminal histories of eight of the nine

defendants to be shackled — everyone except Leonard Brown. He stated that

100

Williams,[55] Casado,[56] Baptiste,[57] Harper,[58] Pless,[59] and Hawthorne[60] — all of whom

had been accused of participating in homicides in furtherance of the Count 2

conspiracy — had an extensive history of involvement with violent criminal

activity.  Gibson and Shaw, neither of whom were accused of any violent activities

in the government's indictment, had comparatively less extensive criminal

backgrounds for shackling purposes.  Gibson's criminal history consisted of a 26-

[55] Aside from the violent activities Williams had been accused of in the indictment, he had been convicted of attempted second-degree murder (albeit thirteen years before the hearing), battery on a police officer, possession of cocaine, and several firearms charges, including a charge of felon in possession of a firearm and use of a firearm in the commission of a felony.

[56] Casado was convicted of attempted first degree murder, use of a firearm by a convicted felon, battery on a police officer, aggravated assault, escape, and other federal firearms offenses.  He also had adjudication withheld with respect to charges of possession of cocaine, aggravated assault, burglary, grand theft, and resisting arrest.

[57] Baptiste had been convicted of attempted first-degree murder, carrying a concealed firearm, possession of a firearm by a convicted felon, and probation violations.

[58] Harper's criminal record contained a conviction for use of a firearm in the commission of a felony, and a 14-year-old juvenile conviction for aggravated battery.  However, he had also been arrested for aggravated assault, battery on a police officer, resisting arrest, and disorderly conduct, and had charges outstanding for cocaine trafficking.  A motion filed by the government before the shackling hearing also stated that Harper had been arrested for possession of cocaine, possession of marijuana, escape, disorderly conduct, grand theft, and battery.

[59] Pless had been convicted of obstruction of justice, possession of marijuana, and providing false information to police.  He had been charged with carrying a concealed firearm, cocaine possession (four times), and resisting arrest with violence, for which adjudication had been withheld, and had been arrested for obstruction of justice, battery, possession of cocaine, and carrying a concealed firearm.

[60] Hawthorne had been convicted of possession of cocaine (thrice), possession of marijuana, petty theft, obstruction of justice, battery on a police officer, resisting [arrest] with violence, resisting [arrest] without violence (twice), threatening a public servant, possession of a firearm by a convicted felon, sale and possession of marijuana (twice), sale of cocaine, and trespass.

year-old manslaughter conviction (arising out of killing her husband in 1974), an arrest for possession of cocaine, and untried charges of aggravated assault and assault and battery. Similarly, Shaw's criminal history listed a manslaughter conviction over ten years old, a conviction for possession of marijuana, and a charge of cocaine possession on which adjudication was withheld.

Finally, Christina Fernandez reiterated much of what Tassone had said regarding the Marshal's recommendation, based not on her personal knowledge but on her staff's assessment, stating that it was made: (1) looking at each of the defendants' criminal histories and the criminal history taken "as a whole"; (2) the number of defendants on trial; and (3) recent, unrelated trials in the Southern District in which unshackled defendants had caused disruptions in court. She acknowledged that her office had decided, on an individual basis, that Baker and Johnson did not need shackles because the former was out on bond and the latter was a paraplegic. She also stated on cross-examination that it would be a "safe assumption" that if Gibson were tried alone, the Marshal's office would not recommend that she be shackled.

Prior to hearing the first witness in this matter, the district court acknowledged that it had to make individualized findings as to each defendant, as well as examining the totality of the circumstances. Moreover, the district judge

102

expressly recognized that the decision whether to shackle was ultimately his independent determination to make. The district court also expressly recognized that shackling is a restraint that should rarely be used. After taking arguments from each of the defense lawyers, the district court found that in this case, shackling was "the appropriate, least restrictive[,] and necessary security measure to be employed" at trial. It did so on the basis of the number of defendants to be tried (eleven, ten of whom were held without bond), the "extensive" violent criminal histories of "a number of" the shackled defendants (including "homicides, attempted homicides, shootings and threats, which . . . gives rise to additional security concerns"), and the disruptions caused by unshackled defendants at prior, unrelated trials in the Southern District.

The district court disagreed with defense counsel's argument that the jury might be able to see the shackles through a gap between the bunting and the floor, determining that the bunting would effectively prevent the jury from seeing the leg irons from the jury box. It further stated that there was little chance that the bunting would look out of place in the courtroom, and thus suggest to the jury that it was concealing something of importance, because: (1) the bunting's color matched the courtroom's carpeting; and (2) the bunting was placed around the government counsel's table, too, as well as on the railing that separated both

counsel tables from the courtroom gallery. The court concluded that the bunting was as "unobtrusive" as possible given the circumstances and would not arouse the jury's curiosity as it was not "focused on any one side of the room".

A review of the pertinent case law, including the Supreme Court's most recent foray into this area in Deck v. Missouri, 125 S. Ct. 2007 (2005), yields these important principles: First, the decision to use shackles to restrain a defendant at trial should rarely be employed as a security device. United States v. Mayes, 158 F.3d 1215, 1225 (11th Cir. 1998). The Supreme Court has observed that "no person should be tried while shackled . . . except as a last resort." Illinois v. Allen, 397 U.S. 337, 344 (1970). Second, the act of shackling a defendant implicates a defendant's right to a fair trial. Among the important interests implicated by shackling are the presumption that a defendant is innocent until proven guilty, Deck, 125 S. Ct. at 2013, the right of the accused to secure a meaningful defense, id., and the need to maintain a judicial process that is not an affront to the dignity and decorum of the proceeding itself. Id.; Mayes, 158 F.3d at 1225.

Third, if a judge intends to shackle a defendant, he must make a case specific and individualized assessment of each defendant in that particular trial. Deck, 125 S. Ct. at 2015. That assessment may include consideration of, among other things, the criminal history and background of each of the defendants, including whether

104

the defendant has a history of violent acts; the number of defendants being tried together; the nature of the charges pending against the defendants, including whether the charged offenses include violent criminal conduct; any past history of conduct by a defendant that may have disrupted a criminal proceeding; and other circumstances, such as threatening behavior against witnesses or court personnel, that may reasonably bear upon the safety of the courtroom and its occupants or upon the danger of escape. As the Supreme Court observed in Deck,

> [t]here will be cases, of course, where these perils of shackling are unavoidable. We do not underestimate the need to restrain dangerous defendants to prevent courtroom attacks, or the need to give trial courts latitude in making individualized security determinations. We are mindful of the tragedy that can result if judges are not able to protect themselves and their courtrooms. But given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case.

Deck, 125 S. Ct. at 2014 (citation omitted). As such, in making the calculus whether to shackle, the district court may not bolster its determination on the basis of other, unrelated cases. See Deck, 125 S. Ct. at 2009 (holding that the use of visible shackles is prohibited unless "that use is justified by an essential state interest - - such as the interest in courtroom security - - specific to the defendant on trial") (emphasis added). Rather, Deck has made clear that the district court must identify particular security concerns, related to the defendants on trial, that justify

105

shackling.  Id. at 2014-15.

Finally, we review the district court's shackling determination for abuse of discretion.  United States v. Durham, 287 F.3d 1297, 1303-04 (11th Cir. 2002).  Thus, "we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard."  United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).

Having laid out these principles, we turn to the shackling determination made in this case.  As noted already, of the eleven named defendants standing trial, nine were shackled (Baptiste, Harper, Pless, Williams, Gibson, Leonard Brown, Casado, Hawthorne, and Shaw), and two were not (Baker, who was out on bond and was a police officer, and Johnson, a wheelchair-bound  paraplegic who was in custody).

The district court found that shackling was the least restrictive and necessary security measure to be employed based upon: (1) the fact that the restraints would not be visible to the jury and the covering bunting was adorned uniformly throughout the courtroom; (2) the large number of violent defendants to be tried; (3) the fact that "a number of defendants present extensive criminal histories . . . involving homicides, attempted homicides, shootings and threats"; and (4) disruptions caused by defendants at an unrelated trial that was apparently

106

conducted earlier in the Southern District of Florida.  The district judge stated that he tried to provide an individualized determination "by listening to each one of [the defendants] individually."

We have said that the first two reasons may weigh in favor of shackling. See United States v. Battle, 173 F.3d 1343, 1346-47 (11th Cir. 1999) (non-visible restraints); Mayes, 158 F.3d at 1225-26 (large number of defendants being tried together).  Moreover, the violent criminal histories of particular defendants may also support a decision to shackle.[61]

It was, however, improper for the district court to shackle the defendants based upon what happened in other, unrelated trials involving different defendants and different charges.  Deck, 125 S. Ct. at 2015.  A "once bitten, twice shy" rationale is not an appropriate consideration in the shackling context.  Deck, 125 S. Ct. at 2015 (Again, "any [shackling] determination must be case specific; that is to say, it should reflect particular concerns, say special security needs or escape risks, related to the defendant on trial.") (emphasis added).  The district court must thus connect its security concerns to the particular defendants and the case on trial.

Despite our concerns that the district court erroneously referenced other

---

[61] Similarly, that the district court "gave defense counsel the opportunity to respond to its concerns and the proposed actions, and to raise alternative proposals," as the court did here, is also a factor in determining whether the court abused its discretion.  Mayes, 158 F.3d at 1225 (internal quotation marks omitted).

unrelated trials, and did not make express defendant-by-defendant findings, we cannot say that this entitles Williams, Casado, Baptiste, Harper, Pless, or Brown to a new trial. Their individual criminal histories, including many violent crimes, the violent crimes for which they were in fact indicted, the sheer number of defendants on trial, the fact that each of the defendants had a full opportunity to respond to the court's concerns and raise alternative proposals, and the lack of any record evidence that the jury could see the shackles, convinces us that the district court did not abuse its discretion in shackling them.

Arguably, Shaw presents a closer case. The indictment did not allege that he was directly involved in any violent criminal activity; and while his criminal history did include one violent act – a manslaughter conviction – that act occurred more than a decade earlier. However, the combination of the sheer number of defendants, the fact that the defense had a full opportunity to respond to the court's concerns and raise alternative proposals, and the lack of any record evidence that the jury could see the shackles, again convinces us that the district court did not abuse its discretion in shackling him.

We have more reservations about the district court's decision to shackle Gibson. The indictment did not allege that Gibson was directly involved in any violent criminal activity. And although she engaged in a violent act in the past,

that history was limited to a twenty-six year-old manslaughter conviction arising out of a domestic dispute. Indeed, the district court decided to shackle Gibson after hearing evidence from the U.S. Marshal's office — which it appeared to credit — that the Marshal would not have recommended that Gibson be shackled if she had been tried separately. Nor did the district court in any way suggest that if she were not shackled, while the others were, this would present a serious risk or danger to the court or its occupants. Moreover, as we have noted already, the district court did not make any express, individualized assessment of Gibson's dangerousness or risk, and erroneously referenced other unrelated trials.

Nonetheless, even assuming arguendo that the district court's decision to shackle Gibson was an abuse of discretion, when considered in combination with the other evidentiary errors already outlined, the prejudice was not sufficiently great to merit reversal of Gibson's conviction. Unlike Deck, the shackles used here were not visible to the jury, and thus did not undermine the presumption of innocence in the jurors' minds such that they were "inherently prejudicial." Deck, 125 S. Ct. at 2015. Nor is there any indication on this record that Gibson was ever impeded from consulting fully with counsel. Rather, as discussed above, the substantial admissible evidence adduced in support of Gibson's conviction, combined with the jurors' return of a not-guilty verdict on Count 17, demonstrates

that on the facts and circumstances of this case, any such error would be harmless beyond a reasonable doubt. We recognize the seemingly increased threats to our courtrooms, and the discretion reposed in the district courts, but we nonetheless remind the district courts that they are required to make case specific and individualized findings when imposing these kinds of serious and onerous restraints.[62]

## E. Denial of Williams' and Casado's Continuance Motions

On June 11, 1999, Georgia-based attorney J. Malik Frederick filed a motion for admission to the Southern District of Florida pro hac vice to represent Williams, with Miami attorney Neil Nameroff acting as local counsel. Frederick's and Nameroff's appearances were entered on the same day. On June 17, 1999, Frederick was arrested in Georgia on money laundering charges; he was released on bond on June 25.

On September 1 and 8, 1999, respectively, the Government returned second and third superseding indictments. On September 30, 1999, Frederick entered a permanent appearance as Williams' lead counsel. On October 14, 1999, Clayton R. Kaiser filed an appearance as local counsel, replacing Nameroff. The district court set trial to begin on February 7, 2000.

---

[62]We do not address the effect of shackling on Hawthorne because he is entitled to a new trial on other grounds.

110

On November 11, 1999, James Benjamin was appointed to represent Casado.

On December 6, 1999, the Government moved to revoke Frederick's bond in his money laundering case, claiming that he had violated the conditions of the bond. On December 17, 1999, a U.S. Magistrate revoked the bond, and on December 22, Frederick was arrested; he remained incarcerated throughout Williams' trial.

On December 30, 1999, Frederick (through an associate) filed a motion to continue Williams' trial at least one month. At a January 7, 2000 hearing on the motion, Williams stated that he had not been involved in the appointment with Kaiser, had no relationship with Kaiser, and wished to appoint a different lead counsel; Kaiser indicated that he had done nothing up to that point other than monitoring events locally and forwarding discovery to Frederick's office in Georgia. The court denied the motion, noting the difficulty of blocking out the length of time on its calendar necessary to try the case, the fact that there was one month left before trial, as well as the fact that Kaiser was responsible as local counsel "for all purposes". The court added that Williams was free to select an alternate lead counsel.

On February 1, 2000, Kaiser moved to be appointed to represent Williams;

111

the motion was granted on February 3. On the same day that Kaiser was appointed, the district court held a status conference, at which Kaiser again requested a continuance. An associate of Frederick's, who was still assisting Williams in the case, stated to the court that no work of substance had been done on the case since the January 7 hearing, and that Williams and Kaiser had never met in that period. Another attorney, Peter Heller, appeared at the hearing and stated that he would agree to appear as lead counsel if a continuance were granted. The district court denied the renewed motion. Benjamin (Casado's attorney) also requested a continuance, stating that he too was unprepared for trial.

On February 7, 2000, the first day of trial, Kaiser renewed his continuance motion. Kaiser indicated that in the month since he was elevated to lead counsel, he had been unable to adequately prepare for the trial, noting that he had been forced to rearrange his work on other matters and had not yet received all of the case files from Frederick's office in Georgia. The court denied the renewed motion, and the case proceeded to trial.

Following direct examination of the Government's third witness, Detective Capote, Casado's counsel stated that he was unprepared to cross-examine, and again requested a continuance or recess. The court denied the request.

Both Williams and Casado challenge the district court's denial of their

112

various continuance motions. We review a district court's denial of a trial continuance for abuse of discretion. Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003).

The Sixth Amendment right to counsel guarantees a defendant "both a fair opportunity to be represented by counsel of his own choice and a sufficient time within which to prepare a defense." Gandy v. Alabama, 569 F.2d 1318, 1321 (5th Cir. 1978). While the denial of a continuance request can in some cases amount to a violation of this due process right to counsel, id. at 1322, the right to counsel of choice is not as absolute as the right to the assistance of counsel. Id. at 1323 (citing, inter alia, United States v. Gray, 565 F.2d 881, 887 (5th Cir. 1978)). As such, the Supreme Court has made it clear that not every denial of a request for a continuance is a denial of due process:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

Ungar v. Sarafite, 376 U.S. 575, 589-91 (1964).

113

The proper exercise of the trial court's discretion thus requires a delicate balance between the defendant's right to adequate representation by counsel of his choice and the general interest in the prompt and efficient administration of justice. Gandy, 569 F.2d at 1323 (citing United States v. Uptain, 531 F.2d 1281, 1291 (5th Cir. 1976)).  Defendants are only guaranteed a fair or reasonable opportunity to select the attorney of their choice.  United States v. Bowe, 221 F.3d 1183, 1190 (11th Cir. 2000) (citing Gandy, 569 F.2d at 1323-24)).

When deciding whether a denial of a continuance impinged on the defendant's "fair and reasonable opportunity" to choose counsel, reviewing courts should consider a number of factors, including: (1) the length of the delay; (2) whether the counsel who becomes unavailable for trial has associates prepared to try the case; (3) whether other continuances have been requested and granted; (4) the inconvenience to all involved in the trial; (5) whether the requested continuance is for a legitimate reason; and (6) any unique factors.  Bowe, 221 F.2d at 1190.  It is of no relevance that substitute counsel has not been shown to have performed incompetently or ineptly.  The claimed deprivation is an arbitrary encroachment on the right to counsel of choice, not a claim of ineffective assistance rendered in the performance by the substitute counsel.  Gandy, 569 F.2d at 1326.

We have previously found that a trial court's denial of a continuance motion

114

violated a defendant's Sixth Amendment right to counsel. In Gandy, the defendant was charged with carnal knowledge of a minor, indicted and served with a copy of the indictment on May 21, 1970, and arraigned in the presence of retained counsel on December 2, 1970. At a hearing on February 22, 1971, from which the counsel was absent, the court set the trial for the next day. At the beginning of the 2-day trial, the defendant's counsel advised the court that on the following day he would be engaged in a civil trial at another court, and would be unable to represent the defendant. The counsel sought a continuance until the conclusion of the civil trial, but his request was denied. Thereafter, the counsel arranged for his law partner, who was present but had no familiarity with the case, to assist in the case; the original counsel would take the lead on the first day, and his partner would take over the case on the second day. Pursuant to arrangement, the trial took place as scheduled, and the defendant was convicted. Id. at 1320.

In holding that the denial of the continuance motion violated the defendant's right to counsel, we noted that: (1) the requested continuance was of a fairly short duration; (2) the replacement counsel was "completely unprepared and unfamiliar with the case"; (3) other continuances had been requested by and granted to both sides; (4) losing the services of retained counsel outweighed any inconvenience to the court or other parties; (5) the requested delay did not appear to be a defense

strategy or dilatory tactic; and (6) the trial court was fully aware of the planned abandonment and all the other factors when the request was denied. Id. at 1324.

In United States v. Verderame, 51 F.3d 249 (11th Cir. 1995), we found a right to counsel violation based purely on the fact that the defendant's counsel was given insufficient time to prepare. In that case, the defendant was charged with conspiracy to possess with intent to distribute marijuana and cocaine. He was arraigned on May 4, 1993, and the trial date set for June 3. He retained counsel on May 7, and filed a continuance motion on May 13. The motion was denied on May 26; successive continuance motions were also denied, the last on June 3. The trial began on June 7, and the defendant was ultimately convicted. Id. at 250-51. We found that the 34 days the defendant had between arraignment and trial was insufficient time for the defendant's counsel to prepare his case, given that: (1) the government had spent years investigating the case; (2) the property forfeiture aspect of the case grew to encompass additional property during that pre-trial period; (3) the cocaine conspiracy charge was dropped four days before trial, shifting the focus to the marijuana charge; and (4) the government could not provide adequate pre-trial disclosure of its documents to the defense within that time. Id. at 252. Thus, we held that in denying the continuance motion, the court had abused its discretion and violated the defendant's right to counsel. Id.

In other cases, we have held that the trial court did not err in denying a defendant's motion to continue in order to seek replacement counsel. In Bowe, for example, the defendant was charged with conspiracy to import cocaine. With slightly over two and a half months to go before the trial, his lead counsel was arrested, and later entered a drug rehabilitation program. The defendant's other counsel requested a continuance until the lead counsel completed rehabilitation, and at a September 14 status conference explained that the defendant wanted to ensure that the lead counsel participated in his defense. The court denied the motion, the case went to trial on November 1, and the defendant was convicted. Bowe, 221 F.3d at 1188.

In that case, we held that the denial of continuance did not violate the defendant's right to counsel. As support for the holding, we noted that: (1) the requested continuance was "lengthy and open-ended"; (2) the defendant still had two other defense attorneys who had been working on the case for six months prior to the trial;[63] (3) the defendant had two and a half months after the lead counsel became unavailable, and nearly one month after the denial of the continuance motion, to find additional counsel for his defense team; (4) the defendant had been

_____

[63] We further observed that although the remaining counsel represented that they had no trial experience, the defendant could have retained a replacement trial counsel. Bowe, 221 F.2d at 1191, n.8.

117

arraigned more than a year before trial; and (5) the court dismissed twelve of the thirteen counts in the indictment, thereby easing the defense's trial burden. Id. at 1190-91.

In United States v. Barrentine, 591 F.2d 1069 (5th Cir. 1979), the defendants were charged with conspiracy to transport gambling paraphernalia and to conduct an illegal gambling business. They were indicted, along with 16 other defendants, on September 27, 1977, informed of the indictment two days later, and retained counsel two days after that. They were arraigned on October 7, and on October 12 were notified that the trial was set for October 31. Once the trial date was announced, defendants and their counsel realized that counsel had a conflict with another case, and on October 14 they moved for a continuance. The motion was denied on October 18 and the trial began as scheduled (lasting 10 days). At the trial's opening, the original counsel's law partner appeared, announced that original counsel would not be available for the trial, and proceeded to represent the two defendants himself. The defendants, as well as their 16 co-defendants, were convicted.

We held that the denial of the continuance motion did not violate the defendants' rights to counsel, observing that (1) the defendants knew of the likelihood they would be prosecuted some 4 ½ months before the trial; (2) the trial

118

involved 47 government witnesses and 18 defendants, and would thus be difficult to reschedule; (3) the other 16 defendants were ready to go to trial on the arranged date; (4) the replacement counsel was as experienced as the original counsel, and appeared reasonably familiar with the case; (5) the attorneys for the other defendants were prepared and vigorously attacked the government's case; and (6) the defendants had time after the denial of their motion to arrange for an acceptable replacement counsel, but failed to do so. Moreover, we stated that "[t]he record supports the inference that [defendants and their attorney] made a calculated attempt to force a continuance notwithstanding their knowledge of the trial judge's strongly voiced contrary ruling." Id. at 1074-75.

Finally, in United States v. Davis, 967 F.2d 516 (11th Cir. 1992), the defendant, a state legislator, was accused of taking bribes in violation of the Hobbs Act, 18 U.S.C. § 1951. She was indicted on October 6, 1989, and trial began two months later on December 4, after the district court denied the defendant's continuance motion. Although we noted that the case involved "extensive discovery," including 40-50 hours of audiotapes, 750 wiretapped telephone conversations, 30 witnesses and 300 subpoenaed documents, we also observed that the tapes and transcripts were available for most of the pretrial period, and that the court had a valid interest in trying the case before the next state legislative session,

in order to allow other state legislators to testify. Id. at 518. Finding that the two month period was adequate time for the defense to prepare, we affirmed the conviction.

Under this case law, Casado's challenge must fail. On the one hand, the instant case involved a great deal of witness testimony and other evidence. The alleged conspiracy covered an eight year period, and involved multiple alleged acts in furtherance. Over one hundred witnesses testified at trial; many of them directly incriminated Casado. On the other hand, most of the witnesses had criminal records that were readily available to the defense for use in cross-examination. Moreover, the court's concern over the difficulty of finding adequate space in its calendar for such a lengthy trial, and of coordinating the schedules of the co-defendants' counsels and the many witnesses, was legitimate:

> The calendar control of modern criminal court dockets, especially in metropolitan communities, is a sophisticated operation constantly buffeted by conflicting forces. The accused's rights . . . are constantly in . . . conflict with the prosecution's legitimate demands for some stability in the scheduling of cases. The availability of prosecution witnesses is often critically dependent on the predictability of the trial list. ...[D]elays and postponement only increase the reluctance of witnesses to appear in court, especially in criminal matters . . . . To permit a continuance to accommodate one defendant may in itself prejudice the rights of another defendant whose trial is delayed because of the continuance.

Gandy, 569 F.2d at 1325 n.9. Further, Casado was indicted nearly a year before

trial, and his counsel was appointed three months before trial. There is no indication that Casado's counsel was impeded in his attempts to access evidence or otherwise prepare.

Though Williams has a somewhat stronger claim, he still cannot prevail. First, the unavailability of his counsel – Mr. Frederick – appears to be bona fide and not attributable to any stratagem of delay. Second, Williams was the primary defendant at trial, cast as the ringleader of the conspiracy. More testimony (from at least thirty witnesses) and other evidence implicated him than any other defendant. Third, Kaiser only had one month's notice that he was being elevated to lead counsel – less time than Casado's lead counsel, or the counsel in Gandy, Verderame, Barrentine, and Davis, had.

On the other hand, as early as June 17 (when Frederick was arrested), Williams had notice that there was a possibility his lead counsel would have difficulty in preparing and trying his case. The government sought to have Frederick's bond revoked on December 6, and the bond was revoked on December 17. Thus, Williams could have begun shopping for a new lead counsel some time prior to January 2000 – perhaps as much as 6 ½ months earlier. Kaiser appeared as local counsel on October 14 – over 3 ½ months before the trial began. Although he states that his participation was extremely limited prior to January, he at least had

121

an earlier opportunity to prepare for the possibility that Frederick's own criminal prosecution would interfere with Frederick's ability to conduct the defense. Further, like the defendant in <u>Bowe</u>, Williams gave no indication as to how much time he would need to prepare the case. Finally, the trial's length, and number of parties and witnesses, made rescheduling particularly difficult.

While the inconvenience that a continuance would have caused the court and the other parties alone would not likely justify a decision to force Williams to go to trial with brand-new, undesired counsel who had no opportunity to prepare, other factors plainly support the district court's decision to deny Williams' continuance. Indeed, Williams is not as blameless as the defendants in <u>Gandy</u> and <u>Verderame</u>. In failing to make arrangements for a backup counsel between the time of Frederick's initial arrest and the denial of his continuance motion on January 7, Williams took a gamble somewhat akin to that of the defendants in <u>Barrentine</u>. With over six months of notice that such a problem was substantially likely to occur, with the admitted means to obtain alternate counsel, and with a local counsel retained over three months before trial, Williams prejudiced himself by waiting until the eleventh (or at least the tenth) hour to seek a solution. The district court did not abuse its discretion in denying his motion for continuance.

**F. Improper Closing Arguments by the Prosecution**

122

Seven defendants (Williams, Casado, Gibson, Shaw, Baptiste, Harper, and Johnson) allege that the prosecutor made improper closing arguments that violated their due process rights and entitle them to a new trial. Specifically, they claim that the prosecutor improperly: (1) bolstered witness testimony; (2) commented on their right to remain silent; (3) asked the jury to act as the "conscience of the community" by returning guilty verdicts; and (4) asked the jury to convict the defendants based on their bad character.

Whether prosecutorial statements, which were objected to at trial, violated due process is a mixed question of law and fact that we review de novo. See United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir.1991). We will reverse a defendant's conviction based on a prosecutor's statements when they are: (1) improper; and (2) prejudice the defendant. Id. at 1206. Improper statements prejudice the defendant when there is "a reasonable probability that, but for the prosecutor's offending remarks, the outcome of the ... [proceeding] would have been different. [A] reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (internal quotation marks and citation omitted). Thus, we examine whether any of the prosecutor's statements were improper, and then review their prejudicial effect in the aggregate. Having done so on this record, we find that the challenged statements, when read in context, are merely

123

permissible discussions of the evidence presented at trial, the prosecutor's

credibility arguments, and the prosecutor's arguments that the evidence has shown

the defendants' guilt.  See United States v. Adams, 799 F.2d 665, 670 (11th Cir.

1986); United States v. Eley, 723 F.2d 1522, 1526 (11th Cir. 1984).

## G.  Sentencing

Seven defendants (Harper, Williams, Casado, Baptiste, Shaw, Hawthorne,

and Pless) also challenge their sentences on appeal.[64]

## 1.  Harper

The jury convicted Harper of violating 21 U.S.C. §§ 841(a)(1) and 846 as

alleged in Count 2 of the indictment.  Section 2D1.1 of the U.S. Sentencing

Guidelines governs the punishment for violations of § 846.  However, that

guideline provides that "[i]f a victim was killed under circumstances that would

constitute murder under 18 U.S.C. § 1111[65] had such killing taken place within the

---

[64] We do not reach the sentencing arguments made by Hawthorne because he is entitled to a new trial on other grounds.

[65] At the time of sentencing, 18 U.S.C. § 1111 defined murder as:

> [T]he unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnaping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

> Any other murder is murder in the second degree.

territorial or maritime jurisdiction of the United States," the district court must instead sentence the defendant under § 2A1.1, the guideline applicable for federal first-degree murder convictions. U.S.S.G. § 2D1.1(d)(1) (2000). Section 2A1.1, in turn, set the defendant's base offense level at 43, which mandated a life sentence. U.S.S.G. § 2A1.1 (2000).

The district court based its decision to sentence Harper under § 2A1.1 on testimony from Johnny Hankins, an associate of Williams, Harper, and other co-defendants, who testified at trial that Williams told him Harper had driven the getaway car for the 1994 Benny Brownlee murder.[66] Harper objected to receiving an enhanced sentence for murder based on hearsay testimony by one witness, but the district court found Hankins' testimony credible and denied the objection.

---

18 U.S.C. § 1111(a) (2000).

[66] Hankins' testimony stated:

> Q:    Did Boobie [Williams] tell you who shot and killed Benny?
> A:    Yes he did.
> Q:    What did he tell you?
> A:    Him and Marvin Rogers kill Benny.
> Q:    Who is Marvin Rogers?
> A:    Marvin Rogers also perished this present time.
> Q:    He's deceased?
> A:    Yes.
> Q:    Is he also one of the individuals that you identified who was driving the vehicle?
> A:    Chico.
> Q:    Who is Chico?
> A:    Mike Harper.
> Q:    Who told you that?
> A:    Boobie told me, Mike also related that information to me.

125

We review the district court's application of the sentencing guidelines <u>de novo</u> and its findings of fact for clear error.  <u>United States v. Grant</u>, 397 F.3d 1330, 1332 (11th Cir. 2005).[67]

The district court did not err in sentencing Harper under §§ 2D1.1(d)(1) and 2A1.1 based on Hankins' testimony, regardless of whether it was hearsay.  A sentencing court may consider any information, (including hearsay), regardless of its admissibility at trial, in determining whether factors exist that would enhance a defendant's sentence, provided that the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence.  <u>United States v. Zlatogur</u>, 271 F.3d 1025, 1031 (11th Cir. 2001); <u>see also</u> <u>Williams v. Oklahoma</u>, 358 U.S. 576, 584 (1959) ("[O]nce the guilt of the accused has been properly established, the sentencing judge, in determining the kind and extent of punishment to be imposed, is not restricted to evidence derived from the examination and cross-examination of witnesses in open court ."); <u>Williams v. New York</u>, 337 U.S. 241, 246-51 (1949) ("[M]odern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent

---

[67] "Although <u>Booker</u> established a 'reasonableness' standard for the sentence finally imposed on a defendant," <u>Booker</u> does not alter the standards we use to review a district court's application of the U.S. Sentencing Guidelines.  <u>United States v. Crawford</u>, 407 F.3d 1174, 1178 (11th Cir. 2005).

126

information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial.").  The sentencing guidelines make the same point.  U.S.S.G. § 6A1.3(a) (2004) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").[68]

---

[68] The recent Supreme Court decisions in United States v. Booker and Crawford v. Washington do not affect our rule that the district court may base sentencing determinations on reliable hearsay.  Booker held that when a district court sentences a defendant under mandatory sentencing guidelines, any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proven to a jury beyond a reasonable doubt.  Booker, 125 S. Ct. at 756.  The Booker Court then struck down as unconstitutional the portions of the Guidelines that made them mandatory and provided for standards of review on appeal, id. at 764, and retained the remaining, advisory, guidelines while instructing appellate courts to review sentences for "reasonableness."  Id. at 765-67.  Notably, the Booker Court did not strike down 18 U.S.C. § 3661, which provides that, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  In fact, Justice Scalia's dissent in Booker indicates that the majority's holding did not alter a sentencing court's ability to rely upon hearsay to make sentencing determinations.  Booker, 125 S. Ct. at 789-90 (Scalia, J., dissenting in part) ("Inexplicably, however, the [majority] opinion concludes that the manner of achieving uniform sentences was more important to Congress than actually achieving uniformity--that Congress was so attached to having judges determine 'real conduct' on the basis of bureaucratically prepared, hearsay-riddled presentence reports that it would rather lose the binding nature of the Guidelines than adhere to the old-fashioned process of having juries find the facts that expose a defendant to increased prison time.")
    Nor does Crawford, absent a more definitive decision from the Supreme Court, alter the rule that may base sentencing determinations on reliable hearsay.  Crawford, as stated above, holds that the Confrontation Clause forbids the introduction of testimonial hearsay at trial unless (1) the declarant is unavailable, and (2) and the defendant has had a prior opportunity to cross-examine the declarant.  Crawford, 541 U.S. at 68.  However, Crawford does not address the use of hearsay, testimonial or otherwise, at sentencing, and we will not extend its holding to the

127

The district court thus did not err in applying § 2A1.1 to Harper's conduct based on Hankins' testimony, nor did it clearly err in determining that Harper in fact drove the getaway car. There is no indication that Hankins' statement lacked sufficient indicia of reliability to support its probable accuracy.

Next, Harper argues that the district court erred when it found him responsible for cocaine base in excess of 50 grams because (1) the evidence before the court was insufficient to make such a finding; and (2) that determination should have been made by a jury, consistent with Apprendi v. New Jersey, 530 U.S. 466, (2000), and Ring v. Arizona, 536 U.S. 584 (2002), and thus by extension, Blakely v. Washington, 542 U.S. 296 (2004), and Booker. We need not reach either argument because any error would necessarily be harmless. The district court properly sentenced Harper under U.S.S.G. §§ 2D1.1(d)(1) and 2A1.1, which mandates a life sentence regardless of the quantity of drugs involved.[69] See United

_____

sentencing context to overrule Zlatogur without further guidance. See Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 344 F.3d 1288, 1291 n.6 (11th Cir. 2003) ("While an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court, the Supreme Court decision must be clearly on point."); Fla. League of Prof'l Lobbyists, Inc. v. Meggs, 87 F.3d 457, 462 (11th Cir. 1996) ("We are not at liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled, by the Supreme Court."). Thus, our holding in Zlatogur that a sentencing court may base sentencing determinations on reliable hearsay is still good law. See United States v. Martinez, 413 F.3d 239, 243 (2d Cir. 2005); United States v. Chau, 426 F.3d 1318, 1323 (11th Cir. 2005); United States v. Dazey, 403 F.3d 1147, 1177 n.7 (10th Cir. 2005).

[69] To the extent that Harper makes his Apprendi/Booker argument with respect to the district court's findings about his involvement in the Brownlee murder, he is not entitled to relief. Harper raised his Apprendi/Booker argument for the first time on appeal, so we review it for

128

States v. Padro Burgos, 239 F.3d 72, 76-77 (1st Cir. 2001).

## 2. Williams

Williams makes the same three challenges to his life sentence raised by Harper. As in Harper's case, Williams was sentenced to life in prison pursuant to U.S.S.G. §§ 2D1.1(d)(1) and 2A1.1, and as in Harper's case, we find no error with the district court's application of these guidelines based on evidence that Williams had participated in several murders connected to the Count 2 conspiracy. Moreover, any error with respect to the district court's determination of drug quantity is harmless given Williams' life sentence under § 2A1.1. See Padro Burgos, 239 F.3d at 76-77.[70]

## 3. Pless

Pless also argues that the district court erred in sentencing him pursuant to U.S.S.G. §§ 2D1.1(d)(1) and 2A1.1, claiming that there was insufficient evidence connecting him to any of the homicides committed in furtherance of the Count 2 conspiracy. In particular, Pless argues that the Roosevelt Davis homicide cannot

---

plain error only. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005). To satisfy the third prong of plain-error review in the Booker context, the defendants must prove that "there is a reasonable probability of a different result if the guidelines had been applied in an advisory instead of binding fashion by the sentencing judge in this case." Id. at 1301. This Harper cannot do; there is nothing in the record that would indicate that the sentencing judge would have imposed a lesser sentence on Harper had the Guidelines been only advisory. Id.

[70] And as in Harper's case, Williams cannot meet the third prong of the plain-error test with respect to his Booker-related claim, which was raised for the first time on appeal.

support the § 2A1.1 sentence, as that homicide was unrelated to the Count 2

conspiracy. However, the district court relied on testimony from Pagan and

Texidor to reach the contrary conclusion. As the district court's conclusion

satisfies the preponderance of the evidence standard, we find no reversible error.

See Padro Burgos, 239 F.3d at 77.[71]

**4. Casado**

Casado disputes the district court's findings with respect to drug quantity on

the basis that the evidence was insufficient to support the findings. This argument

fails for the same reasons that Harper's identical drug quantity argument failed —

Casado was sentenced to life in prison under U.S.S.G. §§ 2D1.1(d)(1) and 2A1.1.

Casado does not challenge the application of § 2A1.1, and thus any error in

determining the quantity of drugs for which he was responsible would be

harmless. See Padro Burgos, 239 F.3d at 76-77.

Casado also filed a motion pursuant to Eleventh Circuit Rule 27-1(c)(16)

adopting Harper's Apprendi/Ring argument with respect to the district court's drug

quantity findings. We granted Casado's subsequent motion for leave to file a

supplemental brief addressing Blakely, limited to discussing Blakely's relevance to

---

[71]While Pless raised a claim based on Blakely for the first time in his reply brief, his failure to raise the issue in his initial brief renders the issue abandoned. See United States v. Levy, 416 F.3d 1273, 1276 (11th Cir. 2005).

the issue adopted. In his supplemental brief, Casado argues that the district court violated the Sixth Amendment by enhancing his sentence based on its findings that he was responsible for the distribution of over 150 kg of cocaine and 1.5 kg of cocaine base and that he had played a leadership role in the drug distribution scheme, facts which were not found by the jury beyond a reasonable doubt.

The challenge to the leadership role finding is barred because Casado did not raise the Sixth Amendment issue in his initial brief and the matter of the firearms finding (unlike that of the drug amount) was not permitted by our grant of Casado's motion to file a supplemental brief (since it was not raised in Harper's brief and thus not adopted in Casado's initial brief). United States v. Dockery, 401 F.3d 1261, 1262 (2005). As to the drug amount finding, Casado's challenge is subject to plain error review, since he never raised a Sixth Amendment/Apprendi-type objection at the sentencing hearing. Under a plain-error standard of review, Casado's challenge fails, since the district court gave no indication that it would have granted a lesser sentence under a non-mandatory guidelines regime, and thus Casado cannot establish that any Blakely/Booker error affected his "substantial rights." See Rodriguez, 398 F.3d at 1298-1301. Moreover, Casado's CCE conviction itself mandated a life sentence, regardless of the additional enhancing factors, so any error would have been harmless.

## 5. Baptiste

Baptiste was convicted of the conspiracy charge alleged in Count 2, and was sentenced to 360 months' imprisonment. On appeal, he raises three challenges to his sentence. He first argues that the district court erred by classifying him as a career offender pursuant to U.S.S.G. § 4B1.1,[72] based on two prior convictions: (1) a conviction for attempted first-degree murder based on his participation in the March 12, 1991 Jetier homicide; and (2) a conviction for carrying a concealed firearm on July 28, 1991. Baptiste contends that these two convictions cannot form the basis for the career offender enhancement because they were for conduct that occurred during the course of the drug conspiracy and thus did not constitute "prior sentences" for purposes of U.S.S.G. §§ 1B1.3, 4B1.1 and 4A1.2(a)(1).

Application of the career offender provision does two things. First, it sets the defendant's base offense level according to a table based on the maximum punishment set by the statute under which the defendant was convicted, if that offense level is higher than the base offense level the defendant would receive without the career offender enhancement. U.S.S.G. § 4B1.1 (2000). Here,

_____

[72] Section 4B1.1 (2000) of the Sentencing Guidelines provides that:

> A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

132

however, Baptiste's base offense level was already higher without the career offender enhancement than it would have been under the table in § 4B1.1, so application of the enhancement had no effect on his base offense level.

Second, the enhancement also automatically places the defendant in the highest criminal history category, Level VI.  Id.  However, Baptiste's criminal record was so extensive that even ignoring the two convictions at issue and the career offender provision, his criminal history category would still be Category VI.  Thus, any error classifying Baptiste as a career offender would be harmless.

Next, Baptiste argues that the court erred in holding him accountable for over 150 kg of cocaine and 1.5 kg of cocaine base.  Specifically, Baptiste argues that the evidence adduced at trial only indicated his responsibility for between 50 and 100 kg of cocaine, and no cocaine base, which would correspond to a base offense level of 36 instead of 38 (and a total offense level of 38 instead of 40).  According to Baptiste, the court improperly held him responsible for Casado's independent distribution of cocaine and cocaine base.

According to the Sentencing Guidelines, a defendant's base offense level shall be determined in part on the basis of:

> [I]n the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of

133

the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

U.S.S.G. § 1B1.3(a)(1)(B) (2000).

Application Note Two to § 1B1.3 clarifies a two-pronged test for co-conspirator liability, under which such liability extends to the conduct of others that was both: (1) in furtherance of the jointly undertaken criminal activity; and (2) reasonably foreseeable in connection with that criminal activity. U.S.S.G. § 1B1.3, cmt. n. 2 (2000). The note further explains that to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). Id.; United States v. Hunter, 323 F.3d 1314, 1319 (11th Cir. 2003).

In this case, it is clear that Baptiste, who was often described as inseparable from Casado, agreed to join the wider drug conspiracy organized by Casado and Williams. Indeed, the government established that Baptiste was present for many of Casado's sales and acted as Casado's sales agent while Casado was incarcerated. Thus, the court did not err in holding Baptiste accountable for Casado's sales, which were made in furtherance of the conspiracy that Baptiste agreed to join, and

134

which were reasonably foreseeable as part of that conspiracy.

Finally, Baptiste contends that his sentence violates <u>Blakely</u> and <u>Booker</u>. In his initial brief, Baptiste adopted by reference (under Fed. R. App. P. 28(i)) Michael Harper's <u>Apprendi</u>/<u>Ring</u> argument, addressing the district court's drug quantity findings. On September 2, 2004, we granted Baptiste's motion for leave to file a supplemental brief addressing <u>Blakely</u>, although we limited the scope of the brief to discussing <u>Blakely</u>'s relevance to the issue adopted. In his supplemental brief, Baptiste argued that the district court violated the Sixth Amendment/<u>Blakely</u> principle by enhancing his sentence based on its findings that he was responsible for the distribution of over 150 kg of cocaine and 1.5 kg of cocaine base and that he possessed a firearm during the course of the drug conspiracy – facts not found by the jury beyond a reasonable doubt.

Like Casado's <u>Blakely</u> challenge to the district court's leadership-role finding, Baptiste's challenge to the firearms finding is barred under our decision in <u>Dockery</u>, because he did not raise the Sixth Amendment issue in his initial brief and the matter of the firearms finding (unlike that of the drug amount) was not permitted by our grant of Baptiste's motion to file a supplemental brief (since it was not raised in Harper's brief and thus not adopted in Baptiste's initial brief). As to the drug amount finding, Baptiste concedes that his challenge is subject to plain

135

error review, since he never raised a Sixth Amendment/<u>Apprendi</u>-type objection at the sentencing hearing. Under a plain-error standard of review, Baptiste's challenge fails, since the district court gave no indication that it would have granted a lesser sentence under a non-mandatory guidelines regime. Thus Baptiste cannot establish that any <u>Blakely</u>/<u>Booker</u> error affected his "substantial rights." See <u>Rodriguez</u>, 398 F.3d at 1298-1301.

**6. Malcolm Shaw**

Like Baptiste, Malcolm Shaw was convicted of the conspiracy charge alleged in Count 2, and was sentenced to 360 months' imprisonment. On appeal, Shaw adopts Baptiste's argument as to "relevant conduct at sentencing," presumably referring to the court's finding that he was responsible for over 150 kg of cocaine, resulting in a base offense level of 38 pursuant to U.S.S.G. § 2D1.1(c)(1). This finding was not erroneous, however, because the district court was entitled to credit Herbert McCrea's trial testimony that he had obtained "hundreds of kilos" of cocaine from Shaw between 1994 and 1996.

**H. Conclusion**[73]

---

[73] We summarily reject the following arguments as meritless:

1. Arguments made by Gibson, Casado, Williams, and Baptiste that the district court improperly allowed the government to go beyond the scope of cross-examination on redirect;
2. Arguments made by Casado and Baptiste that the district court erred by refusing to allow Casado to call Officers Walthen and Mendez as witnesses to impeach Officer Mendez's

136

Because we find that the district court's evidentiary errors denied Johnson and Hawthorne a fair trial, we REVERSE their convictions.  But because we find the district court's errors harmless with respect to Williams, Casado, Harper, Leonard Brown, Malcolm Shaw, Baker, Baptiste, Pless and Gibson, we AFFIRM their convictions and sentences, and REMAND the case to the district court for proceedings consistent with this opinion.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

prior testimony for the government; and

3.    Gibson's argument that the district court erroneously denied a mistrial after the prosecution improperly impeached defense witness Jeffrey Gibson, Gibson's husband, by eliciting that defendant Gibson had been convicted of manslaughter in 1974, 26 years prior to trial, even though the district court sustained the defense's objection, struck this testimony, and told the jury to disregard it.

4.    Arguments made by Williams that the admission of his jailhouse letters constituted error under Rules 401, 403, and 404(b).